GALVESTON, HARRISBURG & SAN ANTONIO RAILWAY COMPANY v.
THE STATE.

No. 2754.

1. **Railway Alternate Surveys.**—If the design in the Constitution of the State was to give the school fund three-fourths or more than one-half of the land granted to corporations, it is reasonable that such purpose would have been stated in uncontingent and unambiguous terms.

2. **Construction.**—The narrow rule of arriving at the meaning of an instrument by reference alone to any one clause, when it includes others relating to the same subject, can not be allowed in construing any written instrument, much less the Constitution.

3. **Constitution did not Set Apart Undivided Half of the Entire Public Domain.**—It is clear that the Convention and people creating the Constitution did not intend to appropriate an undivided one-half of the entire unappropriated public domain to the public school fund. Such act would have stopped the location of lands, as there would then have been no spot in the State unappropriated upon which to make locations. It is manifest that it was not intended that land locating should cease or be

suspended, for it was indicated otherwise by the renewal of forfeited land certificates and the provisions requiring speedy location of all certificates.

4. **Location of Land Certificates Provided for.**—Section 2, article 14, of the Constitution provides "that all genuine land certificates heretofore or hereafter issued shall be located, surveyed, or patented only upon vacant and unappropriated public domain." This anticipated the location of such certificates and assumes that there was unappropriated public domain upon which locations could be made, etc.

5. **Same.**—So as to unexpired certificates and pre-emptions provided for.

6. **Partition not Indicated in Constitution.**—If the one undivided half of all the vacant public lands was vested in the school fund upon the adoption of the Constitution, then before certificate holders, etc., could locate at all a partition was necessary, segregating that owned by the school fund. We see no evidence that such partition or a suit therefor was contemplated, still less that a suit should be instituted for partition of every survey

7. **Same.**—It is not held that a partition suit would be necessary, but held that if the State resort to such suit, unless specially relieved by law it must be governed by such rules in the same manner that other litigants are.

8. **Same.**—Nor does it appear that any other mode of partition was contemplated, else it had been clearly expressed in the Constitution.

9. **Reservation.**—Section 3, article 14, of the Constitution recognizes the power of the Legislature to grant land to railways, but directs "that no reservation of any part of the public domain for the purpose of satisfying such grant shall be made." It seems that the effect of a partition of the public domain into two parts in one of which the railway certificates could be located would be obnoxious, as a reservation was forbidden.

10. **Favored Objects of Legislation, etc.**—There have always existed with the people of this State three prominent objects which through their Constitutions and laws they have worked to accomplish by means of the public domain. These objects were to secure immigration, promote education, and encourage the construction of railways.

11. **Construction.** — The specific directions in the Constitution in regard to the University land "set apart," that it should be "designated and surveyed as may be provided by law," and to the Capitol lands, that "suitable laws" be enacted to carry out the purpose, indicate that the Constitutional Convention did not consider that the general expression in the Constitution relating to the school land was self-executing; and it is inferred that had the intent existed that one-half of the public domain should be preserved intact for the school fund it would have been clearly expressed.

12. **Alternate Sections.**—The Constitution speaks of grants to railways only by the use of the words *alternate sections*, without defining the meaning of the words, or in any way explaining or defining how much or by what process land granted in that way was to be known or secured. This use of the words would require a reference to existing legislation to ascertain what was meant by *alternate sections*, and showing how they were surveyed and to whom they belonged when surveyed.

13. **Same.**—Interpreted by the existing laws the necessary construction of the Constitution in the use of the language "set apart and appropriated for the support of public schools all the alternate sections of land reserved by the State out of grants heretofore made or that may hereafter be made to railroads," is that the school fund should receive one section and the corporation the other.

14. **Construction of Section 2, Article 7, of Constitution.**—We are of opinion that its true meaning and intention is that all then existing lawful claims should be surveyed out of the whole body of unsurveyed public domain, and that alternate surveys for corporations, pre-emptions, and lands granted to counties for school purposes should be surveyed in the same way, until the Legislature had caused to be surveyed and set apart 4,000,000 acres for the University and new Capitol, after which these lands would be excluded from survey, and future surveys for any of the purposes enumerated would be confined to the unsurveyed portion of the public domain.

**15.   Object of Grant of One-Half, etc.** — We believe the object of the clause granting ''one-half of the public domain to the school fund'' was to reach and hold beyond legislative control whatever portion of the public domain remained after the execution of the enumerated purposes.

**16.   Duty of Legislature, etc.**—Whenever and however the Legislature undertook to dispose of what then remained of the public domain after the satisfaction of the then acquired rights, the Constitution required a recognition of the school fund's claim to one-half of such remainder.

**17.   Modes of Segregation of School Lands.**—The statutes recognize surveys in alternate sections as a mode of partition.   The power given the Legislature at any time to provide for the sale of any part of the public land would enable a further partition.   The Constitution entrusted the subject to the Legislature and provided no other method.

**18.   Extent of Appropriation in Constitution to School Fund.** — The Constitution did not appropriate, or intend to do so, the one-half of the whole domain, and in addition thereto one-half of the corporations' alternate sections.   Nor did it absolutely appropriate or intend that there should be appropriated a full one-half of the then unappropriated public domain for the school fund.

**19.   Legislation.**—Discussion of legislation upon the disposition of the public domain and public school fund subsequent to the adoption of the Constitution.

**20.   Calculations as to Lands Granted, etc.**—Examination of the facts bearing upon the disposition of the public land with reference to the school fund, showing what amount went to school fund.

**21.   Protection of School Fund Left to Legislature.**—If the Constitution left it for the Legislature to make the division of the public domain, subject alone to such rights and limitations as the Constitution itself recognizes, it results that what has been done in the premises must be held final and binding on the State.   It will be conclusively presumed that through such division the school fund has acquired all of the domain that it was entitled to under the Constitution.

**22.   Same.**—No disregard of any mandate of the Constitution either by the legislative or executive departments, however often repeated or long continued, can be tolerated by the judicial department as a reason for a like disregard of it by that department.

APPEAL from Travis.   Tried below before Hon. W. M. Key.

The opinion gives a sufficient statement.

*E. P. Hill,* for appellant.—The assignments of error present the question as to the meaning of section 2, article 7, of the Constitution of the State, which is as follows:

''Section 2.   All funds, lands, and other property heretofore set apart and appropriated for the support of public schools; all the alternate sections of land reserved by the State out of grants heretofore made or that may hereafter be made to railroads or other corporations of any nature whatsoever; one-half of the public domain of the State; and all sums of money that may come to the State from the sale of any portion of the same, shall constitute a perpetual school fund.''

The contention on the part of the State is that the intention and effect was to reserve to the school fund one-half of all the public lands subject to reservation at the date of the adoption of the Constitution, April 18, 1876, in addition to alternate sections out of grants to railroads, while the

contention on the part of the defendant is that the expression "public domain of the State" was not meant to embrace lands thereafter taken up under the law granting lands to railroads.

In support of the construction contended for by appellant it is submitted:

1. Such is the plain import of the language employed. No intelligent man would have so framed that section if it had been intended to mean what is claimed on the part of the State. The proceedings of the convention show that the subject was referred to a special committee of seven, who reported the section for adoption. If they had had it in their minds to say that one-half of the then public domain was reserved to the school fund in addition to all alternate sections out of railroad grants, nothing would have been easier than to have said so. That they did not say so by a plain and express declaration is proof convincing that they did not mean it.

2. Under the law regulating grants of land to railroads there was a section for the State for every section for the road, each alternate to the other. The railroad could not have a section without one for the State. The reservation of a section to the school fund and the grant of a section to the railroad were mutually dependent things. The grant of 40 sections to a railroad was an appropriation in fact of 80 sections of land; the railroad had to locate and survey 80 sections, 40 for itself and 40 for the State. So much was this so that the whole body of such lands—the sections received by the railroad and the alternate sections located for the State—are spoken of in the section of the Constitution in question as grants made to railroads. Such grants, whether heretofore or hereafter made, are considered and treated as one subject, as a unit, and disposed of by declaring that the share of the State in all such grants belongs to the school fund.

A Constitution is to be interpreted with reference to the existing legislation of the State (Baltimore v. State, 15 Md., 375) and its known public policy. Grants had never been made to railroads in any other way than in alternate sections, and existing laws reserved the State sections—alternates to the railroad sections—to the school fund. It was expected that the same public policy would continue. The Act of March 18, 1873, set apart and appropriated the alternate sections out of all grants heretofore or hereafter made to railroads to the school fund.

The section in question does not in itself declare a reservation, but merely preserves to the school fund the alternate sections which under existing laws were already reserved; and it was clearly considered that such reservation was existing and actual, and in effect severed from the mass of the public domain all lands that might be thereafter subjected to such declared use (railroad and school fund), so that the expression

"one-half of the public domain of the State" following could have no application to such lands, but was exclusive of them.

3.    The Supreme Court, in the case of Day Company v. The State, 68 Texas, 547, has so construed the section in question.    It says:

"Section 2, article 7, of the Constitution, after declaring that 'all the alternate sections of land reserved by the State out of grants heretofore made or that may hereafter be made to railroads or other corporations of any nature whatsoever, shall constitute a perpetual school fund, provides that 'one-half the public domain of the State,' among the other funds named, 'shall constitute a perpetual school fund.'

"The alternate sections set apart to that fund were in a general sense public domain; but it was not thought that these lands would be embraced under the general terms 'public domain,' hence they were specifically appropriated, as they had been by former laws, and an additional grant was made to the fund of 'one-half of the public domain of the State.'    The words 'public domain,' as here used, meant simply that one-half of the public domain then unappropriated to some use by the Constitution or some precedent obligation should be so appropriated.    It makes that which in a general sense was public domain and that which was unappropriated public domain to the named extent with other things named the aggregate perpetual school fund, formed from funds all of which were in a general sense public domain; some, however, already appropriated, and others unappropriated until this was done by the express declaration that 'one-half of the public domain of the State    *    *    * shall constitute a perpetual school fund.'"

4.    The proceedings of the Constitutional Convention show that this subject was before the Committee on Education first, and that afterwards a special committee of seven was appointed to take charge of this educational clause.    Those committees had before them the past and existing legislation on the subject.

On January 30, 1854, the State adopted the policy of encouraging the construction of railroads by donations of land.    The act of that date donated sixteen sections of land for every mile of railroad constructed in the State.    It was also provided that such lands should be surveyed in sections of 640 acres each, and unless prevented by previous survey or navigable streams, in square blocks of not less than six miles, surveys to be delineated on maps, the even and odd sections being differently colored. The sections with even numbers were reserved to the State and the odd numbers were granted to the railroad company having the survey made. By the Act of February 8, 1860, the law was so amended as to dispense with the six mile blocks, but surveys were still required to be made in alternate sections, the even sections being reserved to the State.    Section 3, article 10, of the Constitution of 1866 set apart as part of the perpetual school fund of the State all alternate sections theretofore or there-

after made.   To the same effect is section 2, article 9, of the Constitution
of 1869.   It had been the uniform policy of the State from January 30,
1854, until the adoption of the Constitution of 1869 to encourage the
construction of railroads by donations of land.   By that Constitution,
however, no donations of land could be made for that purpose.   An
amendment was adopted by the people November, 1872, and ratified by
the Legislature in 1873, authorizing grants of land for that purpose, not,
however, to exceed twenty sections of land to the mile of completed road.
From then until 1882 the former policy of donating lands to railroads
was uniformly pursued.

An act was passed March 18, 1873, entitled "An act to set apart one-
half of the public domain for the support and maintenance of public
schools."   It sets apart and appropriates one-half of the public domain,
" or so much thereof as can be, in the following manner"—in brief all
alternate sections out of grants for internal improvements.   It was doubt-
less seen by the committees that this left the quantity of land that would
go to the school fund uncertain—dependent upon the quantity taken
up by the railroads; and the section of the Constitution was so framed
as to make that certain which was uncertain before, and to grant to the
school fund one-half the public domain in addition to what it had re-
ceived and would receive through the operation of the laws granting lands
to railroads—one-half that might remain when through repeal of such
laws or otherwise such grants should cease.

5.   Suppose, for illustration, that there were at the time the Constitu-
tion was adopted 20,000,000 acres of public domain.   Construe the sec-
tion as contended for by appellee, and the school fund would take one-
half, or 10,000,000 acres, to begin with, and if the other half was taken
by railroad grants, it would receive 5,000,000 acres (in alternate sections)
of that, thus getting 15,000,000 acres in all.

But suppose that no railroad grants were thereafter made, the school
fund could get but one-half, or 10,000,000 acres.

What reason could there be for leaving the matter in that uncertain
state?   On the contrary, adopt the construction contended for by appel-
lant, and of whatever part of the 20,000,000 acres was taken up by rail-
road grants the school fund would get one-half (alternate sections), and
adding the half of what remained would give it 10,000,000 acres.   If no
grants were thereafter made to railroads it would get half, or 10,000,000
acres.   If the whole was taken up in railroad grants, it would get half
(alternate sections), or 10,000,000 acres.   Thus fixing with certainty, in
any phase of it, the quantity of land the school fund should receive.

6.   It is not likely that the section would have passed the Convention
without discussion if it had been understood by any as having the meaning
now contended for by the other side—a meaning making so important a
change in existing laws, and which, if understood, would have suggested

amendment requiring the Legislature to make partition of the public domain accordingly. If that were the meaning, then it is readily seen that all laws granting lands for any purpose might be, in one view of the subject, suspended in their operation until such a partition was made.

7. As before stated, the subject was referred in the convention, after reports had been made from the full committee, to a special committee of seven, which reported the section as it is to the convention. One member of the committee (Mr. Martin) moved to amend by striking out "one-half" and insert "all." A member of the convention (Mr. Stayton) offered as a substitute for the amendment to strike out the words "one-half of the public domain of the State." Both amendments were rejected. The proposed amendment of Mr. Martin is very significant, and coming as it did from a member of the committee of seven makes it doubly so. Suppose that amendment had been adopted, could there be the faintest doubt as to the meaning of the section? Is there any more room for doubt, reading as it does?

8. It was only through the operation of the law concerning grants to railroads and its practical application to the public domain that the school fund could receive any land under it. If the railroad got no land the school fund could get none. It was the beneficiary of that law even to a greater extent than the railroad; the railroad had to pay the expense of the entire location and survey, and received only half the land. If the eighty sections here were not subject to location, if they were not in such situation as that they could be subjected to that special use and in the manner and form prescribed in the law, then neither the railroad nor the school fund can claim any part of them.

By this suit, however, we find the State holding on (for the school fund) to the forty alternate sections which it received, and could only receive, through the operation of that law, when it could not and would not have received an acre of it but that the railroad company by building its road earned the lands and located and surveyed its forty sections and forty for the school fund. The forty sections can not be held by the school fund while the other forty is denied the railroad—the whole structure must stand or fall together. It can not claim all the benefits of the law and the reservation and at the same time deny to the railroad company equal rights.

9. Such has been the uniform and unquestioned construction given and acted upon by all the Legislatures and by all the Governors and officers of the executive department from the time the Constitution was adopted, and under that construction many millions of acres of land have been located, surveyed, and patented.

"Where there has been a practical construction, acquiesced in for a considerable time and generally accepted as correct, especially when this has occurred contemporaneously with the adoption of the Constitution, and by those who had opportunity to understand the intention of the in-

strument, a strong presumption exists that the construction rightly interprets the intention. Great weight is allowed such construction when it has been given by officers in the discharge of their duty, and rights have accrued in reliance upon it which would be divested by a decision that the construction was erroneous. Great deference has been paid in all cases to the action of the executive department where its officers have been called upon under the responsibilities of their official oaths to inaugurate a new system, and where it is to be presumed they have carefully and conscientiously weighed all considerations and endeavored to keep within the letter and the spirit of the Constitution. If the question involved is really one of doubt, the force of their judgment, especially in view of the injurious consequences that may result from disregarding it, is fairly entitled to turn the scale in the judicial mind." Cool. on Const. Lim., pp. 66–71, and cases cited.

"The uniform construction given to a provision of the Constitution by the Legislature, with the silent acquiescence of the people, including the legal profession and the judiciary, and the injurious results which would ensue from a contrary interpretation, are proper elements of a legal judgment on the subject. Great deference is due to a legislative exposition of a constitutional provision, especially when made almost contemporaneously with such provision, and might be supposed to result from the same views of policy and modes of reasoning which prevailed among the framers of the instrument expounded." Sedg. on Stat. and Const. Law, p. 412, and cases cited.

When added to the legislative construction we have, as in this case, the construction of the executive departments, the principle applies with much greater force.

The action of the State functionaries for so many years under this section is a most decisive proof of the universality of the opinion that their acts were founded upon a just construction, independent of the influence it ought to have as a contemporaneous exposition by those who were its immediate framers or intimately connected with its adoption.

Under such circumstances, if the question were one of doubtful construction, such long acquiescence in it, such contemporaneous expositions of it, such uniform and extensive operations under it, such vast property interests affected by it, should set it at rest. Prigg v. Commonwealth, 16 Pet., 621; Brown v. United States, 113 U. S., 568.

*J. S. Hogg*, Attorney-General, for the State. — 1. By the Constitution of 1876 there was unconditionally appropriated to the public free schools an undivided one-half of all the unappropriated public domain within the State at the time said Constitution was adopted in addition to such alternate surveys as should thereafter be reserved from grants to corporations. Const. 1845, art. 10, secs. 1, 2; Const. 1861, art. 10, secs. 1–3; Const. 1866,

art. 10, secs. 1, 2; Const. 1869, art. 9, secs. 1–9; Const. 1876, art. 7, secs. 1, 2, 4, 5; Fannin County v. Riddle, 51 Texas, 360; Milam County v. Bateman, 54 Texas, 153; Day Land and Cattle Co. v. The State, 68 Texas, 526; 92 U. S., 745; 13 Pet., 272; 11 Wis., 286.

2. In disposing of the public domain the people, speaking through the Constitution and laws, were the grantors and appellant and the public schools the grantees. As such these grantees are tenants in common of the lands in controversy, and are subject to the legal and equitable rules governing like conflicting interests as between private persons. 1 Perry on Trusts, sec. 41; Cool. on Const. Lim., 647; 69 Texas, 349; 1 Perry on Trusts, sec. 447; Camoron v. Thurmond, 56 Texas, 22; Mast v. Tibbles, 60 Texas, 301; 52 Texas, 384.

The Attorney-General and *L. D. Brooks, Esq.*, associate counsel for the State, each filed elaborate arguments.

HENRY, ASSOCIATE JUSTICE.—In December, 1878, appellant, a railroad corporation, located forty land certificates granted to it by the State upon public land lying in the county of Crockett. The certificates were for 640 acres each, and at the same time appellant caused to be surveyed forty alternate sections for the State. The field notes of the eighty sections were returned and filed in the General Land Office in March, 1879, and in June, 1880, patents were issued to appellant for its forty sections.

The State instituted this suit against the railway company in the form of an action of trespass try title to recover one-half of the forty sections patented to it.

The defendant pleaded not guilty.

The cause was tried without a jury and judgment was rendered in favor of plaintiff for the recovery of the land.

The record contains the conclusions of the judge, based on an agreed statement showing the following facts with regard to the public domain:

"The unappropriated public domain amounted, in acres, on the 18th day of April, 1876 (that being the day the Constitution was adopted), to 71,961,277.

"Since said date it has been disposed of as follows: Surveyed by virtue of certificates and scrip, 54,713,741 acres; surveyed under pre-emption claims, 1,638,688 acres; surveyed for the University under grant made by the Constitution, 1,000,000 acres; surveyed for the University under Act of April 10, 1883, 1,000,000 acres; lands surveyed and set apart for building the State Capitol, 3,050,000 acres; lands sold under the Act of July 14, 1879, 8,043,127 acres; surveyed and set apart for counties, as county school lands, under Acts of March 26, 1881, and April 7, 1883, and other prior laws, 1,515,721 acres; surveyed for common school fund, under Act

of April 10, 1883, 1,000,000 acres; total surveys for all purposes since April 18, 1876, 71,961,277 acres.

"3.    That of the said 54,713,741 acres surveyed by virtue of certificates and scrip, there have been returned for the benefit of the school fund, in alternate sections surveyed by virtue of alternate scrip issued to railroad and other corporations, 20,967,199 acres.

"4.    That of said 54,713,741 acres surveyed by virtue of certificates and scrip as aforesaid, there were surveyed under and by virtue of what are known as Confederate scrip 3,411,156 acres, of which there were returned for the benefit of said common school fund 1,705,578 acres.

"5.    That said 20,967,199 acres surveyed by virtue of alternate scrip issued to railroad and other corporations and returned as aforesaid for the benefit of the common school fund, and said 1,705,578 acres surveyed in alternate sections by virtue of Confederate scrip and returned for the benefit of the common school fund, and 1,000,000 acres surveyed for said common school fund under said Act of April 10, 1883, together with 176,493 acres surveyed and returned for the benefit of the common school fund in the years 1876, 1877, and 1878, making in the aggregate 23,887,535 [a mistake in addition, the correct amount is 23,849,270] acres, constitute all the lands of said 71,961,277 acres of public domain that have been surveyed for the benefit of the common school fund since the 18th day of April, 1876.

"6.    That of said 54,713,741 acres of public domain surveyed as aforesaid by virtue of certificates and scrip, there were surveyed for the benefit of railroads and other corporations and individuals 30,826,906 acres."

"8.    The lands sued for in this action were located and surveyed at the time and in the manner and by virtue of alternate railroad scrip issued to defendant in the year 1877, as alleged in plaintiff's petition.

"9.    There has been no partition of said 71,961,277 acres of public domain or any part thereof other than as herein stated.

"10.    That of the lands that constituted the unappropriated public domain of the State of Texas immediately before the taking effect of the present Constitution of said State, as much as one-half of the same remained unsurveyed on the 17th day of December, 1878, after the sections part of which are sued for in this action and the alternates thereto had been surveyed for defendant."

We quote some of the provisions of the Constitution of 1876 bearing on the questions:

Section 3, article 14:    "The Legislature shall have no power to grant any of the lands of this State to any railway company except upon the following restrictions and conditions:

"1.    That there shall never be granted to any such corporation more than 16 sections to the mile, and no reservation of any part of the public domain for the purpose of satisfying such grant shall ever be made.

"2. That no land certificate shall be issued to such company until they have equipped, constructed, and in running order at least 10 miles of road, and on the failure of such company to comply with the terms of its charter, or to alienate its land at a period to be fixed by the law, in no event to exceed twelve years from the issuance of the patent, all said land shall be forfeited to the State and become a portion of the public domain and liable to location and survey."

Section 15, article 7: "In addition to the lands heretofore granted to the University of Texas, there is hereby set apart and appropriated for the endowment, maintenance, and support of said University and its branches 1,000,000 acres of the unappropriated public domain of the State, to be designated and surveyed as may be provided by law."

Section 6, article 7: "All lands heretofore *or hereafter* granted to the several counties of this State for education or schools are of right the property of said counties respectively to which they were granted, and title thereto is vested in said counties."

Section 57, article 16: "Three millions acres of the public domain are hereby appropriated and set apart for the purpose of erecting a new State Capitol and other necessary public buildings at the seat of government, said lands to be sold under the direction of the Legislature; and the Legislature shall pass suitable laws to carry this into effect."

Section 6, article 14: "To every head of a family without a homestead there shall be donated 160 acres of public land, upon condition that he will select and locate said land and occupy the same three years and pay the office fees due thereon. To all single men of eighteen years of age and upwards shall be donated 80 acres of public land upon the terms and conditions prescribed for heads of families."

Section 2, article 14: "All unsatisfied genuine land certificates barred by section 4, article 10, of the Constitution of 1869, by reason of the holders or owners thereof failing to have them surveyed and returned to the Land Office by the first day of January, 1875, are hereby revived. All unsatisfied genuine land certificates now in existence shall be surveyed and returned to the General Land Office within five years after the adoption of this Constitution or be forever barred; and all genuine land certificates hereafter issued by the State shall be surveyed and returned to the General Land Office within five years after issuance or be forever barred; *provided, that all genuine land certificates heretofore or hereafter issued shall be located, surveyed, or patented only upon vacant and unappropriated public domain.*"

Section 2, article 7: "All funds, lands, and other property heretofore set apart and appropriated for the support of public schools; all the alternate sections of land reserved by the State out of grants heretofore made or that may hereafter be made to railroads or other corporations of any nature whatsoever; one-half of the public domain of the State; and

all sums of money that may come to the State from the sale of any portion of the same, shall constitute a perpetual school fund."

It is contended by appellee "that by the Constitution of 1876 there was unconditionally appropriated to the public free schools an undivided one-half of the unappropriated public domain within the State at the time said Constitution was adopted, in addition to such alternate surveys as should thereafter be reserved from grants to corporations."

It is insisted that the expression "*one-half of the public domain*" must be given all the force that the words imply, unrestrained and unmodified by what precedes them in the same section or by what is found in other articles of the Constitution. It is insisted that that clause in the Constitution is self-executing and had the immediate effect of appropriating to the school fund an undivided half of the then unappropriated public domain that was not otherwise appropriated by other provisions of the same Constitution.

The application of the proposition contended for is that of the 71,961,-277 acres then belonging to the unappropriated public domain 4,000,000 acres were appropriated by the Constitution for building a new capitol and to the University, leaving a balance of 67,961,277 acres, of which one undivided half, or 33,980,633 acres, were by the self-operating force of the Constitution appropriated to the school fund.

If no land was surveyed for railroad or other corporations, it is not contended that the Constitution appropriated more than one-half of the public domain; but if under the Constitution and laws corporations become entitled to grants of land, and such lands were surveyed, as they must have been, in alternate sections, it is contended that in addition to the alternate surveys set apart by the Constitution to the school fund, that fund became the owner of one-half of the other, or the railroad alternates, also. In other words, if none of the public domain should be acquired by corporations, only one-half of it was intended to be or was in fact appropriated to the school fund. If all of it was earned by corporations, then three-fourths of the whole was appropriated to the school fund. If less than the whole should be surveyed by corporations, then the school fund would own three-fourths of all that was so surveyed and one-half of the remainder.

It is not easy to see why it was proposed to adopt such a rule of division, or if it was intended to be adopted why suitable language was not used to express it. The convention could have forbidden the grant of any land to railroads. It had the power to appropriate either one-half or three-fourths to the school fund; and if it was intended that fund should have three-fourths of it, no reason is apparent why the quantity of the appropriation was made uncertain by its being made to depend upon the quantity earned by corporations.

If the purpose was to favor the school fund by giving it three-fourths this mode of appropriation would lead toward a defeat of such purpose,

because its direct tendency would be by lessening the interest of the corporations to diminish the quantity earned by them, and in the same proportion that the corporations took less the school fund would have done the same thing.

It stands to reason that if the design was to give the school fund three-fourths, or more than half, the Constitution would have been made to so express in uncontingent and unambiguous terms.

The narrow rule of arriving at the meaning of an instrument by reference alone to any one clause, when it includes others relating to the same subject, can not be allowed in construing any written instrument, much less the Constitution.

If it be true that the Constitution operated of itself to appropriate an undivided one-half of the entire unappropriated public domain to the school fund, as it is contended it did, then it necessarily follows that since its adoption there has been no unappropriated public domain. Since then there has been no spot in Texas upon which a man could set down his foot without placing it on appropriated land. It is contended that the convention and people in creating the Constitution intended to accomplish that result. It is clear that they did not. It is equally clear that if they did so intend they also designed that the location of the public domain should cease; because, as we have seen, section 2 of article 14 of the Constitution contains a plain and positive command that "all genuine land certificates heretofore or hereafter issued shall be located, surveyed, or patented *only* upon vacant and *unappropriated* public domain."

Did the convention intend to stop, or to even indefinitely delay, the location and survey of the public domain? If so, why does the Constitution provide, as we have seen it does in the section last referred to, for reviving "all unsatisfied genuine land certificates" that were then barred by the provisions of a previous Constitution? Why speak them into life and in the same breath forbid their location? Why urge the speedy location of the revived and all other land certificates, providing for their extinguishment if not located within five years, and at the same time forbid their location for an indefinite or even a limited time? When the Constitution was urging dispatch in the location of the public domain, even to the extent of extinguishing the right as a punishment for want of dispatch, is it reasonable to conclude that it intended to forbid locations until partition had been made of the public domain into two halves and one had been set apart to the school fund and the other for location, and at the same time neither made provision itself for such a partition or directed the Legislature to make it?

If the school fund appropriates an undivided half of the whole, so that no entirely unappropriated land can be found, how is section 6 of article 14 to be enforced? That section, as we have seen, donates "to every head of a family without a homestead 160 acres of public land." The Con-

stitution did not intend that an undivided half of the whole should vest in the school fund immediately upon its adoption, and still for each actual settler who so desired to take 160 acres of it. No more could it have intended that the settler, instead of taking the 160 acres promised him, should have an undivided interest of 80 acres in either the 160 acres or in the entire public domain.

The record in this case shows that 1,638,688 acres have been appropriated by actual settlers under this section of the Constitution. Was a title to an undivided half of these acres vested in the school fund by the Constitution and before their settlement? And may each settler be now sued by the State for title and partition?

This court judicially knows that besides the alternate land certificates granted to railroad and other corporations prior to the adoption of the Constitution, there were large numbers of genuine and unsatisfied certificates that had been issued to people who had, under the laws in force, the right to have them located on the unappropriated public domain in solid bodies.

Did the convention intend to repudiate these claims? To the very contrary, when the vitality of some of them had been destroyed by limitation, it revived them.

But if an undivided half of the whole domain out of which they were to be satisfied was appropriated by one provision of the Constitution, and by another provision the owners were forbidden to locate them upon any land that had been appropriated, how were they to be satisfied? Why, then, were they recognized at all? Even if the Constitution contained no prohibition against their being located on appropriated land, still if the school fund took on the adoption of the Constitution an undivided one-half interest in the whole domain, such certificates would, when located, instead of appropriating their quantity of land take only half of it, and that an undivided interest.

If, as is contended by the Attorney-General and as it was decided by the district judge, the Constitution vested title in the school fund to an undivided one-half interest of the whole, so that no location on it could be made so as to acquire title to the whole of the location, how was the right of counties to acquire lands recognized by section 6 of the same article to be enforced? Certainly the Constitution did not intend that counties should be either delayed or have less than the whole of the land located for them. With regard to counties the expressive language was used, "and title thereto is vested in said counties." If the same result was intended the same thing could have been said about the lands devoted to the school fund.

The Attorney-General contends that the Constitution from the date of its adoption held in abeyance all locations of the public domain until one-half of the whole had been partitioned and set off to the school fund. If

he is correct in his contention that the title to one-half of the whole vested in the school fund as an undivided owner by the adoption of the Constitution, it is true that such a partition would, in that view, have had to be made before other scrip owners could have located and acquired for themselves the full quantities called for by their certificates.

But in the absence of any direction or provision in the Constitution for making such a partition, by whom and how was it to be accomplished? As to the method, could it have been intended that the whole public domain should be surveyed and valued? Values and not acres are the criterions by which divisions of properties between tenants in common are made. If the State resorts to the remedy of partition, we can see no good reason why it should not observe the well known rules governing that remedy, which would require it to partition the whole of the land it claims in one suit in which all adverse interests are parties.

We can not believe that the Constitution contemplates that any such suit should ever be prosecuted. But still less do we believe that it contemplates that the State may have a separate suit for partition against the owner of every tract of land that has been located and surveyed since its adoption and recover judgment for one-half of the land, as it did in this case, on its claim to own an undivided half interest in the whole, without giving any account of the value of what it has received and still holds, and notwithstanding the fact that when the location it attacks was made there remained unlocated much more of the public domain than was required to meet its demand when measured by its own contention.

We do not mean to be understood as saying that the State must seek its remedy by a partition suit and subject to the ordinary rules of that remedy. What we do mean to say is that when it may properly resort to such remedy, it must, unless specially relieved by law from their operation, be governed by such rules in the same manner that other litigants are. Neither do we believe that it was ever contemplated that by the action of the Legislature or any officer of the government, by estimation, calculation, or otherwise, one-half of the public domain should be set apart for the school fund by counties, or by lines of longitude or latitude, or in any other manner, so that the lands subject to location would lie in bodies to themselves. We think if such an unaccustomed proceeding had been intended it would have been clearly expressed. To the contrary, it seems evident from the whole instrument that no such purpose existed.

Section 3 of article 14 of the Constitution contains an express recognition of the power of the Legislature to grant lands to railroad corporations, but directs "that no reservation of any part of the public domain for the purpose of satisfying such grant shall ever be made."

If by any means a separation of the public domain into distinct parts of two or more was practicable, so as to distinguish the land belonging to the school fund from that subject to location, it seems to us such desig-

nation of the particular part for the location of the railroad certificates would be such a reservation as is prohibited by this provision. No doubt one cause of prohibiting a reservation or setting apart of certain lands for the location of railroad certificates was to aid in distributing the construction of the roads to all parts of the State more than would be the case if the land earned by them lay only in one section.

There have always existed with the people of this State three prominent objects which, through their Constitutions and laws, they have worked to accomplish by means of the public domain.

These objects were to secure immigration, promote education, and encourage the construction of railroads.

It can not be disputed that the Constitution of 1876 had in view not one alone but all of these objects, and one of them no more than another can be disregarded when engaged in the task of ascertaining its true meaning.

The Attorney-General contends that one-half of the public domain was set apart for the benefit of schools by the Constitution. It must be admitted that 1,000,000 acres was set apart to the University and 3,000,000 for building a new Capitol. It will not be contended, however, that the claims of others had to be held in abeyance until the University and Capitol grants were satisfied.

The convention evidently did not believe that the general expression that lands for these purposes were set apart and appropriated would be self-executing, and therefore, with reference to the University land, it made the further direction that it should be "designated and surveyed as may be provided by law," and with regard to the Capitol lands it commanded the Legislature to pass "suitable laws" to carry the provision into effect. We see no escape from the conclusion that had it been intended that one-half of the whole domain should be preserved intact for the school fund, some similar direction would have been made to give effect to such intention. The language used with regard to the Capitol and University lands is that they are "set apart," and the same language is used in the very section under discussion with regard to property previously appropriated, but not so with regard to "one-half of the public domain."

The conclusions of law upon which the judgment of the District Court in favor of the State was rendered are thus stated in the findings of the judge:

"When the Constitution was adopted the State owned nearly 72,000,000 acres of land that had never been surveyed or appropriated in any way, and was commonly designated as 'public domain.' It seems to me that, according to the plain meaning of the language used, it should be held to grant an undivided half of the 72,000,000 acres, and that whatever other

grants were made or authorized by the Constitution should be taken out of the other half after partition and segregation of the half so granted.

"It was evidently expected by the framers of the Constitution that as soon as practicable after its adoption the Legislature would provide for a partition of the public domain and have the moiety appropriated by the Constitution to the school fund surveyed and set apart from the balance; and if this had been done every provision of the Constitution could have been enforced without producing embarrassing results."

The Attorney-General in his argument filed in this court says: "As 'one-half' of the public domain was unconditionally appropriated to the schools, appellant's title to any of the land might be seriously questioned, for its surveys were made with notice that no partition had ever been made so as to give the school fund its part, and that therefore none of the lands it located were in fact or in law *unappropriated.* If the State is content the appellant certainly ought to be."

In the year 1854 the Legislature passed an act to encourage the construction of railroads by donation of lands. The act provided for a grant of sixteen sections per mile of constructed road, and directed that the surveys should be made in sections of 640 acres each, and that no location should be made unless at least two surveys connected together could be obtained. The act required the surveys to be numbered by the Commissioner of the General Land Office from one upwards, and provided that "the even numbers shall be reserved to the State and the odd numbers granted to the company having such surveys made."

The Constitution of 1869 forbade the grant of land by the State to aid in the construction of railroads. This constitutional prohibition having been removed by an amendment of the Constitution authorizing the Legislature to make such grants, the Legislature, on the 18th day of March, 1873, passed an act among other things providing that "all land certificates heretofore issued, as well as those hereafter issued to any railroad company or other corporation of any nature whatever for internal improvements or any other object, or any lands hereafter granted in any manner to any of said companies or corporations for any such object, shall be located and surveyed in alternate sections of 640 acres each and as directed by the Act of 1854."

No general law granting lands to railroads under the amendment to the Constitution was passed until 1876, after the adoption of the present Constitution, but subsequent to the amendment and previous to the adoption of the Constitution of 1876 many such grants were made in the acts chartering such corporations and were in force at the date of the adoption of the Constitution, and the lands under such grants were then in process of being earned.

It will be seen that the Constitution speaks of grants to railroads only by the use of the words "alternate sections," without defining the mean-

ing of the words themselves, or in any way explaining or defining how much or by what process land granted in that way was to be known or secured.

It is a necessary inference that the words were used with reference to laws then in force explaining what was meant by "alternate sections," and showing how they were surveyed and to whom they belonged when surveyed.

As we have seen, the general law on the subject referred for specifications in these particulars to the Act of January 30, 1854, by which the odd numbered sections of alternate surveys were "granted to the company having such survey made."

Interpreted by these laws the necessary construction of the Constitution in the use of the language, "set apart and appropriated for the support of public schools. all the alternate sections of land reserved by the State out of grants heretofore made or that may hereafter be made to railroads," is that the school fund should have one section and the corporation the other.

It can not be disputed that the interpretation of the clause was intended to be made in the light of existing and previous legislation on the subject. Even without such aid the Constitution, standing alone, must by every recognized rule of construction be held to mean that one section is to belong to the school fund and the other one to the corporation.

Construing the whole section, either by itself or in connection with all of the provisions of the Constitution by which it may be affected, we are of the opinion that its true meaning and intention is that all then existing lawful claims should be surveyed out of the whole body of unsurveyed public domain, and that alternate surveys for corporations, pre-emptions, and lands granted to counties for educational purposes should be surveyed in the same way, until the Legislature had caused to be surveyed and set apart 4,000,000 acres for the University and new Capitol, after which these lands would be excluded from survey; and future surveys for any of the purposes enumerated would be confined to the unsurveyed portion of the public domain.

We believe that the object of the clause granting "one-half of the public domain" to the school fund was to reach and hold beyond legislative control whatever portion of the public domain remained after the execution of the enumerated purposes. It was known that existing claims that were entitled to be located in solid bodies would not appropriate but a few millions of acres and comparatively a small part of the whole. It was not believed that donations to the counties for school purposes and pre-emptions combined would consume more than a few millions, still leaving a large balance. It was not known that railroad or other corporations would, under the system of making alternate surveys, consume all of the balance, and hence in order to reach any undisposed of quantity,

after supplying the purposes mentioned in the Constitution, and to prevent the appropriation by the Legislature of more than half of such remainder to purposes not mentioned in the Constitution, said clause was put in, by which the Legislature is deprived of the power to appropriate more than half of the public domain that remains at any time to other purposes.

While the Legislature was bound at all times to respect locations already made by settlers under the pre-emption laws, and surveys made for counties for school purposes and those made for corporations, and all other vested rights, it was at no time required to abstain from disposing of the one-half that was subject to its control to await the acquisition of future claims for any of said purposes.

Whenever and however the Legislature undertook at any given period to disposed of what then remained of the public domain after the satisfaction of the then acquired rights, the Constitution required a recognition of the school fund's claim to one-half of such remainder.

The only partition or segregation of the interest of the school fund from the body of the whole public domain was intended to be made primarily through the system of alternate grants to corporations, which had long been in use and was at the same time the safest and the least expensive system that could be devised in behalf of the State.

In the next place, it was contemplated that with the power that existed in the Legislature at any time to provide for the sale of and make other proper disposition of the balance or unvested remainder of the domain, it would be easily within its power to provide for a division with the school fund until the last acre was gone.

The Constitution trusted the Legislature in that respect, and as it provided no other remedy it must be held that the purpose was to abide by the division made under its direction, through whatever instrumentality it was accomplished.

If at any time a part of the remainder, as it then existed, has been devoted to a purpose not recognized by the Constitution without any recognition of the interest of the school fund in the act, and without its being otherwise provided for in any prior or subsequent law, the question thereby raised is different from the one before us and does not require an answer from us now.

Not only is it incorrect to hold that the Constitution appropriated or intended to provide for the appropriation of one-half of the whole domain and in addition thereto one-half the corporations' alternate surveys, but it is equally incorrect to say that it absolutely appropriated or intended that there should be appropriated a full one-half of the then unappropriated public domain for the school fund.

As we have said, the provisions of equal dignity, and unlimited with

regard to pre-emptions and counties, if not its recognition of the claims of private scrip holders, forbid such a conclusion.

The construction placed upon the Constitution by the Legislature, both as to what was granted to the school fund and the mode of partitioning and segregating the land to which it was entitled from the body of the public domain, has not been left in doubt. It caused an actual survey to be made of the grants for building a new Capitol and to the University.

The first Legislature that assembled after the adoption of the Constitution passed a general law granting to railroad companies 16 sections of land for each mile of road constructed, to be surveyed in alternate surveys, one to belong to the corporation and the other "to the State for the benefit of the public school fund."

The next Legislature disposed of all the lands in Greer County, appropriating one-half of them to the school fund. Act Feb. 25, 1879.

Again, the Act of July 14, 1879, that directed the sale of all of the public domain in Nolan and fifty-three other counties named in the act, set apart one-half of the net proceeds arising from the sales to the public free schools and the balance to the payment of the bonded debt of the State.

The Act of April 9, 1881, granting lands to disabled Confederate soldiers made the required division by directing that the certificates should be located in alternate surveys, one of which was expressed in the act to be for "the benefit of the permanent school fund." The act does not in words say that the other one shall belong to the soldier or owner of the certificate, but nobody has hesitated to give it that construction.

The quotations we have made sufficiently show that the Legislature interpreted the Constitution to intend that scrip holders, at the date of its adoption, were authorized to survey their certificates in solid bodies, and that it intended that the lands granted to settlers and to counties should be surveyed in solid bodies, and that railroads were entitled to hold the alternate sections surveyed by them, after which the remainder of the public domain was to be equally divided by some appropriate direction of the Legislature by which it was disposed of.

The only instance in which the Legislature failed to provide for such partition that has come under our observation was in the Act of April 26, 1876, commonly known as the Veteran Act, by which the certificates granted were allowed to be located in solid bodies, without regard to any claim of the school fund.

It will be seen from the agreed statement of facts included in the findings of the court that of 71,961,277 acres of unappropriated domain, or the 67,961,277 acres that it is claimed was to be equally divided with the school fund, 54,713,741 acres were surveyed by virtue of scrip, of which the court finds the school fund received only 23,887,535 acres.

It is evident that the failure to get the full half of the 54,713,741 acres

must have resulted from the location of such scrip as the Constitution and laws authorized to be located in solid bodies; the quantity that was so located is not shown by the record before us. It is not claimed or shown that the school fund has not acquired its full one-half of all the lands surveyed by corporations.

In some respects we do not think that the conclusions from the facts agreed upon by the parties or as found by the court give a quite correct representation of how much less than half of the original 71,961,277 acres, or, as diminished by the Capitol and University grants, of the 67,961,277 acres, the school fund has received. In the first place, we think the quantity ought to be still further diminished by the 1,515,721 acres and the 1,638,688 acres surveyed for counties and settlers under other provisions of the Constitution, thus reducing the quantity to 64,806,868 acres, one-half of which is 32,403,434.

It seems quite clear that to the estimate of what the school fund has received ought to be added at least one-half of the 8,043,563 acres sold under the act of July 14, 1879, one-half of the proceeds of which was directed to be paid to the school fund. This makes the quantity actually received by the school fund amount to 27,871,552 acres. This calculation leaves the school fund 5,282,153 acres short of one-half of the public domain not consumed by specified appropriations under the direction of the Constitution—a deficiency that we are left to conclude was created mainly by the location of land scrip authorized by the Constitution and veteran scrip directed by the Legislature, both in solid bodies. The record before us fails to show what quantity of veteran scrip was so located.

Instead of devoting only one-half of the 8,043,127 acres sold under the Act of July 14, 1879, to the school fund and appropriating the other half to the payment of the public debt, it was certainly within the power of the Legislature to have appropriated the whole of it to the school fund. If that had been done that fund would be very little short of having in fact received full one-half of the whole.

It is not clear that a proper construction of the concluding words in section 2 of article 7, reading, "and all sums of money that may come to the State from any portion of the same," does not make the whole of the proceeds of all sales of the public domain belong to the school fund.

Speaking for myself, I think a correct construction of the last two clauses, reading, "one-half of the public domain, and all sums of money that may came to the State from the sale of any portion of the same, shall constitute a perpetual public school fund," does appropriate the whole instead of one-half of the proceeds of such sales to said fund.

While it remains land it is one-half, but if the land shall be converted into money, then it is the whole. The meaning must be determined by answering the inquiry, to what do the words "any portion of the same" refer? To construe them as referring to the expression "one-half of the

public domain" is to make the last clause surplusage and of no effect, as without them the preceding expressions would unquestionably include the proceeds when it should be sold as well as the land itself. Some effect can be given the last clause only by making it refer to the words "public domain," and it ought to be given some effect rather than to make it meaningless and surplusage.

There is nothing inconsistent with other parts of the same section or with other parts of the Constitution in so construing the clause, and indeed it might well have been considered a useful means of equalizing the division of the domain, when making it, as was intended, through the passage of laws rather than by actual surveys of the ground. If a wrong to the school fund has been committed in this respect, it is still in the power of the Legislature to repair it.

If we are right in the conclusion that the Constitution left it for the Legislature to make the division of the public domain, subject alone to such rights and limitations as the Constitution itself recognizes, it results that what it has done in the premises must be held final and binding on the State. It will be conclusively presumed that through such division the school fund has acquired all of the domain that it was entitled to under the Constitution.

It is proper to say in conclusion, that no disregard of any mandate of the Constitution, by either the legislative or the executive departments of the State government, however often repeated or long continued, can be for one moment tolerated by the judicial department as a reason for a like disregard of it by that department.

But when, as in this case, seven successive Legislatures have through a period of thirteen years acted upon a given construction of the Constitution; when the department entrusted with the immediate administration of the land system of the State has uniformly concurred in that construction; and when successive Governors of the State, eminent for their patriotism and intelligence (more than one of them having first served with distinguished success in this court), have approved it, we feel that nothing less than an absolute conviction that they have all been wrong would justify us in so deciding.

The duty to decide correctly was as incumbent on them as it can be on ourselves.

The people who made the Constitution, with the knowledge of the construction that was being given to it, have without protesting year after year sent up to the capital other Legislatures to pursue the same policy.

The lands have been assessed and taxes upon them have been demanded and received by the State, and the people, with unhesitating trust in the intelligence and honor of the State government, have bought and sold them.

Our opinion is that the judgment of the District Court ought to be

reversed and judgment here rendered in favor of the defendant, and it is so ordered.

*Reversed and rendered.*

Delivered December 13, 1889.

Chief Justice Stayton dissenting—at the time stating he would file dissenting opinion.

MOTION FOR REHEARING.

*J. S. Hogg*, Attorney-General, for motion.—The State now moves this court for a rehearing of the above entitled cause, and hereby assigns the following reasons therefor:

1.   Contrary to the court's opinion, the Constitution expressly dedicated one-half of the public domain belonging to the State at the date of its adoption to the public free school fund, in addition to the alternate sections that the Legislature should, in the exercise of its discretion, reserve out of grants that might thereafter be made to railway or other corporations.

2.   That the court erred in holding that said "one-half clause" was not self-executing, and that there was no provision requiring the Legislature to put it in force, for the reasons:

(1)   That all unqualified provisions of the Constitution are mandatory and require legislative and judicial obedience.

(2)   That section 42 of article 3 thereof expressly provides that "the Legislature shall pass such laws as may be necessary to carry into effect the provisions of the Constitution."

(3)   That in pursuance of and in obedience to said constitutional provision the Legislature, as shown by Revised Statutes, articles 3703 and 4031, expressly appropriated "one-half of the public domain" of the State, and in addition thereto each alternate section reserved out of railway grants, to the use of the public free schools.

3.   The court erred in holding "that the object of the clause granting one-half of the public domain to the school fund was to reach and hold beyond legislative control whatever portion of the public domain remained after the execution of the enumerated purposes," for the reasons:

(1)   This conclusion is based on the false premise that the Constitution required grants to be made to railways, or that they were made by that instrument itself.

(2)   That, followed to the logical and practical result, it rendered the "one-half" clause inoperative, useless, and nugatory.

(3)   That by it the said "one-half" clause, in itself an express grant without qualification, is made subordinate to and dependent on the contingent and qualified "alternate" clause.

4. The court erred in holding that the Governors, Land Commissioners, and the Legislatures of Texas had ever construed or acted on the Constitution agreeably to its opinion, for the reasons:

(1) That no other Governor except Hon. O. M. Roberts ever had an opportunity to construe said provision, as the law of 1876, granting lands to railways, was repealed by Act of April 22, 1882, on the ground that the public domain was exhausted; and he, on two occasions, in his inaugural address and message to the Legislature, expressly declared that one-half the public domain of the State belonged, and should be set apart, to the school fund in addition to the alternate grants received from railway surveys.

(2) That in obedience to the said Governor's recommendations, the Legislature in 1879 did appropriate one-half the said public domain for the public schools, in addition to the alternates theretofore reserved to the State by Act of 1876 out of railway grants.

(3) That the report of the engineer on which the certificates to railways were issued, the act of the Land Commissioner in issuing and signing them, the act of the county and district surveyor in locating them on public domain, their subsequent file in the Land Office and the issuance of patents (if any) thereon, were all ministerial, clerical, and not discretionary or judicial acts requiring serious consideration of constitutional provisions.

(4) That the court's opinion is in conflict with its previous opinions on the same question, for that, in the case of Fannin County v. Riddle, 51 Texas, 368, rendered in 1879, it held that the Constitution "unreservedly dedicated one-half of the public domain to the public free schools." And in Day Land and Cattle Company v. The State, 68 Texas, 547, this court, in passing on the very question under consideration that arose under Act of 1879, held: "In so far as the act in question appropriated one-half of the unappropriated land in Greer County to this (school) purpose, it only carries into effect in the particular territory the mandate of the Constitution."

Wherefore, in view of the premises, the State prays this court to have notice hereof duly served on E. P. Hill, Esq., counsel for appellant, who resides in Harris County, Texas, and that a rehearing of this said cause be granted, and the errors in the opinion heretofore rendered corrected.

ARGUMENT SUPPORTING MOTION.

In view of the fact that if the court's opinion remains unchanged the State of Texas will lose 15,000,000 acres of land which it claims for the public free schools under the Constitution and laws, this case ought to receive more careful consideration than possibly could have ever been given it by overburdened judges at the last term. An overworked court

is cause of public distress, which must be regretted, though it can be re-lieved; but an act, especially from a high judicial source, that besets a constitutional provision is a public calamity over which generations yet to come may mourn.   Is the opinion in question correct?   If it is, then it ought to stand, though by it the State should be pauperized.   If it is not, then the steady nerves of a righteous court ought to pen a correc-tion, though the consequences should bring grief even to the millions.

To the point:   The contention of appellee is that by the Constitution of 1876 there was unconditionally appropriated to the public free schools an undivided one-half of all the unappropriated public domain within the State at the time said Constitution was adopted, in addition to such alternate sections as should thereafter be reserved from grants to corpora-tions.   Lying within the following section of that instrument rests the issue:

"All funds, lands, and other property heretofore set apart and appro-priated for the support of public schools; all the alternate sections of land reserved by the State out of the grants heretofore made or that may hereafter be made to railroads or other corporations of any nature what-soever; one-half of the public domain of the State; and all sums of money that may come to the State from the sale of any portion of the same, shall constitute a perpetual public school fund."   Art. 7, sec. 2.

A majority of this court in its opinion here complained of denies the correctness of the State's proposition, overrules the decision of the court below, reverses and renders the case in favor of appellant company, upon substantially the following grounds:

1.   That said "one-half" clause is not self-executing, and there is no provision of the Constitution requiring the Legislature to put it in force.

2.   "That the object of the clause granting one-half of the public do-main to the school fund was to reach and hold beyond legislative control whatever portion of the public domain remained after the execution of the enumerated purposes."

3.   That the Legislatures, the Governors, and Land Commissioners had for a period of thirteen years uniformly concurred in a different construc-tion from that contended for by the State.

Boiled down, the foregoing three points are about what may be culled from the court's very lengthy opinion giving a meaning to the troublesome hyphenated two words "one-half" found in the article on "Education" in the Constitution.   True the court quotes other provisions of that instru-ment, but in all candor it is submitted that neither of them is connected or in conflict with or have any interdependent relation to the one on which the question at issue pends.   It also alludes to legislative and executive construction, but fails to cite the law, the acts, or the messages.

The court's argument that the "one-half" clause is not self-execut-ing fails, because the principle is well settled in Texas that "any provis-

ion of a Constitution is self-executing to the extent that anything done in violation of it is void." See Watson v. Aiken, 55 Texas, 536; Hemphill v. Watson, 60 Texas, 679.

Besides this, the Constitution expressly provides that "the Legislature shall pass such laws as may be necessary to carry into effect the provisions of the Constitution." Art. 3, sec. 42. If, therefore, the Legislature failed to pass a law putting the "one-half" clause in force, or if it passed a law contravening it, or if the railway company located on land appropriated by it, the act, in whole or in part, according to the facts, was necessarily void. By positive legislation, however, it has been put in force. Rev. Stats, arts. 3703, 4031.

In explaining the object of the "one-half" clause the court contends that it was intended "to reach and hold beyond legislative control whatever portion of the public domain remained after the execution of the enumerated purposes." What "enumerated purposes?" Where were they enumerated? What was the part of the public domain that this "one-half" clause proposed to "reach and hold beyond legislative control?" If any of it was to be held beyond legislative control, what was to become of it?

If this rule fixed by the court to give effect to the "one-half" clause in question can be put into operation, then failure is impossible. Certainly in speaking of the "enumerated purposes" that shall first be "executed" before that clause can take effect, reference is made to the Constitution. The "enumerated purposes" expressed in that instrument that must first be satisfied out of the public domain, therefore, should be reviewed and the court's rule applied to them.

. The first provision on the subject of public domain is in article 7, on "Education," and is as follows:

"Section 2. School Fund, what Constitutes. All funds, lands, and other property heretofore set apart and appropriated for the support of public schools; all the alternate sections of land reserved by the State out of grants heretofore made or that may hereafter be made to railroads or other corporations of any nature whatsoever; one-half of the public domain of the State; and all sums of money that may come to the State from the sale of any portion of the same, shall constitute the perpetual school fund."

Is there any "enumerated purposes" in this section that must be "executed" before the "one-half" clause shall be given effect? If so, what purpose is it?

. Under the article on education is it possible that the Constitution expressed a purpose to build railways or to aid other corporations? The will, the purpose, expressly set forth in it was to establish and endow a system of public free schools, and to make it "the duty of the Legislature of the State to establish and make suitable provision for the support and main-

tenance" of them. For this purpose it dealt only with the public domain, and in doing so, among other things, it, perhaps unfortunately, provided that "all the alternate sections of land reserved by the State out of grants heretofore made or that may hereafter be made to railroads or other corporations of any nature whatsoever \* \* \* shall constitute a perpetual school fund."

To contend that this quoted part of the section under consideration required the Legislature to aid railroads by granting them lands is to assert it also meant that all "other corporations of any nature whatsoever" should have a part of the public domain. The use of the words "or that may hereafter be made to railroads or other corporations of any nature whatsoever" can by no rule of construction or of logic be grouped into the batch of "enumerated purposes" that denied the "one-half" clause full force. They certainly did not express the purpose of the Constitution to said railways, any more than salt companies, by land grants. So far as that clause is concerned the Legislature had as much power to grant public domain to corporations to construct turnpikes, canals, macadam roads, and the like, or to clean out rivers, run boats, or to navigate the air by balloons, as to donate them in aid of railways. By it there is no limit as to amount that might be given or the purpose for which it should be used. Under it 1,000,000 as easy as 10 acres to the mile of railroad could be given.

When it appropriated "all the alternate sections of land reserved by the State out of the grants heretofore made" to corporations, it gave something fixed and certain and placed it beyond legislative appropriation to other purposes, for under the Act of January 30, 1854, page 11, there had been saved to the State out of the alternate grants to railways at least $1,000,000 worth of land. The schools got this. But when it granted "all the alternate sections of land reserved by the State out of grants \* \* \* that may hereafter be made to railroads or other corporations of any nature whatsoever," it gave nothing absolutely, for there was nothing from that source then to appropriate. It depended on several contingencies:

(1) That some kind of a corporation would ask for or want lands.

(2) That the Legislature might pass a law granting them.

(3) That the grants so made were in alternates.

If the corporations did not earn or should not be granted lands, or if so they were not alternates, or if in alternates they were not reserved to the State, then from this source the school fund could get nothing.

Certainly the "one-half" clause did not have to wait for satisfaction on account of any "enumerated purpose" in that provision.

2. The second appropriation of land is to the University, which is "1,000,000 acres of the unappropriated public domain of the State, to be designated and surveyed as may be provided by law." Art. 7, sec. 11.

Is this one of the "enumerated purposes" that is held to be superior to and must be satisfied before the "one-half" clause can be given effect? If so, it was only one-seventieth part of the public domain then in existence, and no law was passed until the adoption of the Revised Statutes in 1879 putting it in force. Rev. Stats., art. 4023.

By what rule can a grant of one-seventieth of the whole have precedence over that which gives one-half of it? It seems the Legislature took a different view from the court, for when it made the appropriation for the University is also expressly set apart "one-half of the public domain of the State" to public free schools. Rev. Stats., arts. 3703 and 4031.

3. The third and last constitutional appropriation was "3,000,000 acres of the public domain * * * for erecting a new State Capitol." Art. 16, sec. 57.

Although the Constitution "set apart" this land and required the Legislature to "pass suitable laws to carry the section into effect," no action was taken by the Legislature to do so until February 20, 1879.

Perhaps this was one of the "enumerated purposes," after the execution of which the "one-half" clause was to receive vitality. Admit it, subtract it and the University 1,000,000 from the whole, and there yet remained 67,000,000 acres undisposed of. But why should an appropriation of one-twenty-third of the public domain have precedence over that of "one-half?" The Legislature evidently did not think it had, for the same year by two different provisions it appropriated to the schools "one-half the public domain" of the State. Rev. Stats., arts. 3703, 4031.

4. Another mandatory provision that can not be called an appropriation or grant says: "To every head of a family without a homestead there shall be donated 160 acres of public land, * * * and to all single men of 18 years of age and upwards shall be donated 80 acres of public land," upon certain terms. Art. 14, sec. 6.

But call this one of the "enumerated purposes" on which the court dwells with so much force, that must be complied with before the educational "one-half" can be given life, then what is the result? Up to 1888 only 1,638,688 acres of land, as shown by the agreed statement of facts in this case, had been appropriated or claimed under that provision. Added to the 1,000,000 University and the 3,000,000 State Capitol grants it will show only 5,638,688 acres of land included within the "enumerated purposes." Deducted from the 71,961,277 acres of public domain unappropriated when the Constitution took effect on April 18, 1876, there yet remained 66,322,589 acres to be used for some unenumerated purposes, unless this court will concede that the "one-half" clause should rise to the importance and be classed among the "enumerated purposes" to which it alludes. Though that provision may be considered one of the "enumerated purposes," the Legislature did not regard it paramount to the school fund, as witness the Act of August 17, 1876, page 168, requiring the

pre-emptor or homesteader in locating his home to survey an equal amount of land for the public free schools.

In determining, however, what the court meant by the "enumerated purposes" that should be executed before this "one-half" clause "was to reach and hold beyond legislative control whatever portion of the public domain remained" thereafter, the following quotation from the opinion will shed much light:

"There have always existed with the people of this State three prominent objects which through their constitutions and laws they have worked to accomplish by means of the public domain.

"Those objects were to secure immigration, promote education, and encourage the construction of railroads. It can not be disputed that the Constitution of 1876 had in view not one alone but all of these objects, and one of them no more than another can be disregarded when engaged in the task of ascertaining its true meaning."

Without going beyond the present Constitution it is well to draw the court's attention to its mistake in the view thus taken of the "prominent objects" the people had in sight when they adopted that instrument:

1.   To "secure immigration."   "The Legislature shall have no power to appropriate any of the public money for the establishment and maintenance of a bureau of immigration, or for any purpose of bringing immigrants to this State." Const., art. 16, sec. 56. This is the only provision in the Constitution on that subject. Comment seems unnecessary.

2.   To "promote education."   "A general diffusion of knowledge being essential to the preservation of the liberties and rights of the people, it shall be the duty of the Legislature of the State to establish and make suitable provision for the support and maintenance of an efficient system of public free schools." Const. 1845, art. 10, sec. 1; Const. 1861, art. 10, sec. 1; Const. 1866, art. 10, sec. 1; Const. 1869, art. 9, secs. 1–9; Const. 1876, art. 7, sec. 1. See also Constitution 1836, General Provisions, sec. 5.

It prescribes also for the endowment and support of them, first, out of the public domain; second, by State taxes; third, local taxation; fourth, from sale of county school lands. Id., secs. 2, 3, 4, 5, 6. Certainly here is a very prominent object, and it speaks for itself.

3.   To "encourage the construction of railroads." "The Legislature shall have no power to grant any of the lands of this State to any railway company except upon the following restrictions and conditions: First, that there shall never be granted to any such corporation more than sixteen sections to the mile, and no reservation of any part of the public domain for the purpose of satisfying such grant shall ever be made. Second, that no land certificate shall be issued to such company until they have equipped, constructed, and in running order at least ten miles of road," etc. Art. 14, sec. 3.

" The Legislature shall have no power to make any grant or authorize the making of any grant of public money to any * * * corporation whatsoever." Art. 3, sec. 51.

" The Legislature shall have no power to authorize any county, city, or town * * * to lend its credit or to grant public money or thing of value in aid of or to any * * * corporation whatsoever." Art. 3, sec. 52.

" No county, city, or other municipal corporation shall hereafter * * * make any appropriation or donation to any corporation." Art. 11, sec. 3.

How this court can arrive at the conclusion that immigration, railways, and education stood side by side in importance with the people as the " three prominent objects which through their constitutions and laws they have worked to accomplish by means of the public domain," is difficult to comprehend in view of the foregoing quoted provisions. Aid to immigration is prohibited, encouragement of railways is permitted only, while the support of public schools is required. Nowhere does that instrument expressly or by implication declare that immigration or railways either are " essential to the preservation of the liberties and rights of the people," but by clear language it does so say as to " a general diffusion of knowledge."

An investigation of the proceedings of the Constitutional Convention on this point would certainly be refreshing, if not instructive. To one who did not take part in framing that instrument the " signs" along the trackway of those honored delegates indicate that as to railways the " oxcart" doctrine was difficult to resist; as to immigration the " elbow-in-the-sea" sentiment held sway; and as to education the patriotic spirit of the fathers, so prominently shown since the Constitution of 1836, overwhelmed the convention, and culminated in laying the foundation for that which had repeatedly been solemnly declared was " essential to the preservation of the liberties and rights of the people."

The " educational element" in that body had the power, and dealt in concessions only to those who advocated " railway aid." No grant was made to any kind of corporations. Nor was the Legislature required to aid them. It had the right to do so in the absence of constitutional prohibitions. So the convention placed limitations upon that power by saying that " not more than sixteen sections to the mile" should be granted, and that " no reservation of any part of the public domain for the purpose of satisfying such grant shall ever be made." Art. 14, sec. 3.

A retrospective view of the past, an examination of the six Constitutions of Texas, without drawing on current events of the times that have ripened into history, will deny the correctness of the court's proposition that " there have always existed with the people of this State three prominent objects (immigration, education, and railways), which through their

constitutions and laws they have worked to accomplish by means of the public domain."

The Constitution of 1845 commanded the Legislature to make suitable provisions for the support and maintenance of public schools (art. 10, sec. 1) by taxation (art. 10, sec. 2) and by grant of lands to the respective counties for such purposes. Art. 10, sec. 3. Nowhere in it were railways or immigration mentioned.

The Constitution of 1861 also required the Legislature to provide for the support and maintenance of public schools in the same language and manner as that of 1845. Art. 10, secs. 1–4. Neither did it mention immigration or railways.

So did the Constitution of 1866 impose on the Legislature the same duty (art. 10, sec. 1), and endowed the schools out of the public domain (secs. 2–6), and provided for taxation in addition thereto. Sec. 7.

For the first time, however, the Legislature was required by it to aid and encourage railroads. Art. 7, sec. 36. How? By donation of public lands? No. It only conferred power on that department to "guarantee the bonds of railroad companies to any amount not exceeding $15,000 per mile," on very restrictive conditions, among which was that "the State shall always be secured for all bonds guaranteed for any railroad company by a first lien or mortgage upon the road, rolling stock, depots, and franchises." And it also gave the Comptroller authority "to take possession of any railroad in default of paying any bonds which may be guaranteed by the State." It nowhere authorized or required the Legislature to aid such corporations by land grants; nor did it mention immigration at all.

This leads to a consideration of the memorable Constitution of 1869. Following up all the former ones, it spoke out on education, and also made it "the duty of the Legislature of this State to make suitable provisions for the support and maintenance of a system of public free schools" (art. 9, sec. 1), and provided that the whole proceeds of sale of the public domain should go to that purpose, besides a large share of taxes. Secs. 6, 7. But, as held by the court in this case, it "forbade the grant of land by the State to aid in the construction of railroads."

However, it did provide for the encouragement of immigration. No doubt of this; but as a means of defraying the expense incident thereto it said: "The Legislature shall have power to appropriate part of the ordinary revenue of the State for the purpose of promoting and protecting immigration." Art. 11, secs. 1, 2. It did not authorize the use of public domain in that way. For fear that "Castle Garden" would be turned in on Texas, or from some other cause, the people revolted at this "immigration quickstep," for they expressly prohibited the like by the provision of the Constitution of 1876 herein quoted.

Summarized the six Constitutions of Texas controvert the court's as-

sertion as to the three leading objects of the people in disposing of the public domain, in the following particulars:

(1) All the Constitutions made it the duty of the Legislature to provide for the support and maintainance of public free schools, and the last three of them made appropriations of public domain therefor.

(2) No Constitution has ever made it the duty of the Legislature to aid railways out of the public domain.

(3) Only two out of the six Constitutions authorized aid to railways —one by legislative guaranty of their bonds, the other by land grants— while one forbade the grant of lands to them, and three never mentioned them at all.

(4) Four out of the six Constitutions ignored the question of immigration; one authorized legislative aid out of the general revenue to it; and the other expressly prohibited legislative efforts in that direction.

Without intending offensive repetition the question again arises, On what Constitution or law does the court base its declarations that "there have always existed with the people of this State three prominent objects (immigration, education, and railways) which through their Constitutions and laws they have worked to accomplish by means of the public domain," and "that the Constitution of 1876 had in view not one alone but all of these objects, and one of them no more than another can be disregarded when engaged in the task of ascertaining its true meaning?"

If in discharging the task of ascertaining the true meaning of the "one-half" clause of the Constitution of 1876 the court looks beyond the instrument itself into legislative acts to support the theory that the "three prominent objects" referred to were in view and were intended to be accomplished by means of the public domain when the people adopted the Constitution, it must also fail. The first general law granting lands in aid of railroads was passed January 30, 1854. By its own terms it expired at the end of ten years. It was never revived, re-enacted, or extended according to constitutional requirement at any time. At any rate, it was by reason of conflict repealed by the Constitution of 1866, and intentionally so by the one of 1869. The next and only other law similar to it, or in any way granting aid to railways, was that of 1876, expressly repealed in 1882. It is true an amendment to the Constitution was passed in 1873, authorizing the Legislature to grant land aid to railways, but there was no general law passed to give it force. This much for legislation on the subject.

The only law mentioning the subject of immigration that can be found was the act which established a "bureau" for that purpose, passed in pursuance of the Constitution of 1869.

On the subject of education no session of the Legislature has passed for many years in succession without it taking a prominent and sometimes the leading part in the proceedings. Laws after laws have been passed

and amended until now they occupy more space in the statutes than those on most any other question. They have not been repealed, nor has public support of public free schools been withdrawn. Why? Because the Constitution, to say nothing about public sentiment, commands that they shall be supported and maintained, as they are essential to the rights and liberties of the people.

How about railway aid? It has been long since withdrawn. Why? The Legislature was not commanded to aid them, and therefore, in the exercise of its discretion, with or without excuse, it repealed the law on the subject in less than six years after it was passed.

How then can the court give these "three important objects" equal dignity and weight in construing any clause of the Constitution?

The court's declaration that the Legislature and Governors have for a long period of years given the "one-half" clause a different construction from the one contended for by the State is wholly unsupported by the laws and records on that subject. The opinion in making this announcement fails to quote law to support it, or to notice several and in fact the most important laws and official utterances that contradict it. Examine them and see.

It is perhaps permissible to again draw the court's attention to the facts, verified by the records, that the first session of the Legislature under the present Constitution assembled on the 18th day of April, 1876, the day the Constitution took effect, and the second convened on the 14th day of January, 1879. That on the 5th day of May, 1876, the first Governor elected under that Constitution was promoted to the United States Senate, where he has ever since remained. Succeeding him under the law the Lieutenant-Governor became the Executive after the adjournment of the Legislature, of course under necessarily embarrassing circumstances. In the nature of things he could not do much more than "hold the office" and be responsible for the full execution of every constitutional provision, without an opportunity to express his views in official form except as he retired from office.

On the assembling of the next Legislature the first duly elected Governor under that Constitution, who had ample notice and time for investigating all fundamental questions and maturing a line of policy, in his inaugural address on January 21, 1879, made use of the following language to the Legislature:

"There are other obligations imposed upon the government of the State by the Constitution of equally as high a nature, which are to devote one-half of all the public lands to the public school fund, and 1,000,000 of acres to the University fund, and 3,000,000 of acres to the building of a capitol of the State. Under the present policy of procrastination these obligations will not be met, and the people will have to be taxed to per-

form them." Inaugural Address of Gov. O. M. Roberts, Jan. 21, 1879, House Journal, 1879, p. 112.

"The free common schools have their foundation in the Constitution of the State. The mode and means of creating a permanent fund therefor, and of an available fund, with the manner of its distribution annually, are prescribed in the same instrument. It results in fixing it as a duty upon the government of the State, and not as a charity, to educate the rising generation.

"Its permanent fund consists of surveyed lands of about 21,000,000 acres, and half of all the vacant domain, making 15,000,000 acres more, set apart by the Constitution." Message of Gov. Roberts, Feb. 10, 1879, House Journal, p. 342.

This "construction" is of no doubtful meaning, and its source will hardly be criticised as authority on such questions.

It was with prophetic ken that this faithful Governor called attention to the "policy of procrastination," and as a result thereof predicted the necessity of taxation on the people, for in 1883 an amendment to the Constitution was submitted by the Legislature and adopted by the people requiring taxes to be levied to raise revenue to aid in supporting the public free schools.

As the preceding Legislature had only passed a law (August 17, 1876) recognizing the "one-half" clause to the extent of the territory embraced in that act, the one to whom this message was given proceeded in every conceivable way to give the Constitution full force as to that part now under consideration. The court's attention is therefore invited to several of the provisions leaning that way:

The first Legislature to give effect to this provision was in the Act of August 17, 1876, withdrawing from the mass of public domain certain lapsed railway reservations. Within said reservations no lands could be located after that act took effect, except the 3,000,000 acres for the State Capitol and such as pre-emptors should want for homesteads. As to the latter, the act expressly provided that "whenever a pre-emption survey of 160 acres or of 80 acres shall be made for any settler, a like quantity shall be made adjoining said pre-emption survey for the public free school fund of Texas. The settler having the pre-emption survey made shall pay to the surveyor the fees for both the pre-emption survey and the one for the school fund." Acts 1876, ch. 104, p. 168.

This act was passed by the Legislature that met on the day the Constitution took effect, and is certainly a very clear recognition that the public free school fund was then entitled to "one-half" the domain, which even the pre-emptor must respect. It now appears as articles 3969 and 3970, Revised Statutes.

Next in order is the Revised Statutes adopted at the next Legislature, in 1879:

"The constitutional provisions for public schools are hereby appended as a part of the school law of this State."

Section 2, article 7: "All funds, lands, and other property heretofore set apart and appropriated for the support of public schools; all the alternate sections of land reserved by the State out of grants heretofore made or that may hereafter be made to railroads or corporations of any nature whatever; one-half of the public domain of this State; and all the sums of money that may come to the State from the sale of any portion of the same, shall constitute a perpetual school fund." Rev. Stats., art. 3703, secs. 1, 2.

The court seems to have overlooked this law in its opinion. It will be seen that by the Act of 1876 each alternate railway grant was reserved to public free schools. The provision last quoted, adopted three years later, set apart to the schools "all the alternate sections of land reserved by the State out of grants * * * made to railroads," and also "one-half of the public domain of this State."

Here is legislative appropriation, constitutional construction, and execution. The Legislature did not stop here. It further provided, under the caption of "The Public School Lands," as follows:

"All the alternate sections of lands reserved by the State out of grants heretofore made or that may hereafter be made to railroads or other corporations of any nature whatever, one-half of the public domain, and all other lands heretofore set apart or that may hereafter be set apart for the benefit of public free schools, shall constitute a part of the perpetual free school fund." Rev. Stats., art. 4031.

No discussion of the foregoing law is indulged in by the court. Close observance of it will show that it is not a literal copy of the Constitution as is article 3703, but is a transposition of it so as to leave off the first and fourth subdivisions of section 2, article 7, but to retain both the "alternate section" and that same troublesome "one-half" clause. Under the peculiar phraseology of this article it would not be amiss to say that it was a legislative appropriation of public domain, a legislative construction of the Constitution, or a legislative execution of a duty imposed on it by organic law. Let the court hold it to be either, and the effect and result is the same—the public free schools have set apart to them "one-half of the public domain" in addition to the railway alternates reserved by the Acts of 1876 and 1854 to the State. But it may be contended that this statute is also inoperative, for the reason that no rules are prescribed for its enforcement. The statute further says:

"All lands heretofore or hereafter surveyed and set apart for the benefit of the public free schools, the University, the Lunatic Asylum, the Blind Asylum, the Deaf and Dumb Asylum, and the Orphan Asylum shall be sold and leased under the provisions of this act." Rev. Stats., art. 4038.

"After any such lands have been surveyed and subdivided in accordance

with the provisions of the preceding article, and such surveys and subdivisions have been platted on the maps of the General Land Office, such lands may be sold for their real value, but in no case for a less price than $1.50 per acre." Rev. Stats., art. 4043.

The "preceding article" referred to was article 4039, Revised Statutes, that required the school part of the public domain to be surveyed and subdivided into quarter sections with a view to their sale. It was repealed at a later day because of "the great expense that will be entailed upon the State if said articles remain in force." Gen. Laws 1879, p. 169.

Mark the points: It was not repealed on account of the "one-half" appropriation, nor for the reason that all the school lands were to be surveyed on the "alternate plan" by the railway companies, nor that the Legislature regarded the railway surveys paramount to the school grant, but because, as expressed in the act, of the great expense that such surveys at that time would entail upon the State.

Moreover, this court has already held that a grant of this kind is a sufficient appropriation of the land, and amounts to a segregation of it from the mass of public domain so as to preclude its appropriation by others. Day Land and Cattle Company v. The State, 68 Texas, 526.

Keeping in view that same "one-half" clause, the Legislature, after giving it general effect, proceeds in various ways to recognize and enforce it, in each special instance calling into exercise its control and disposition of the "public domain." Following are a few acts showing legislative recognition of it:

"One-half to be surveyed by pre-emptors for the school fund." Act 1876, p. 168.

"One-half the unappropriated public domain in Greer County appropriated to the public school fund." Act 1879, p. 16.

"One-half of the amount realized from the sale of the first 50,000 acres of land sold under this act shall be deposited in the treasury of the State to the credit of the common school fund." Act Feb. 20, 1879, sec. 17, p. 11.

"One-half the net proceeds of sales under the provisions of this act shall be and are hereby set apart for the benefit of the public free schools of the State." Act July 14, 1879, sec. 10, p. 49.

By the Act of March 11, 1881, more territory was added to the reservation contained in the foregoing act.

One-half to be surveyed for school fund alternate with grants to Confederate soldiers. Act 1881, p. 122.

"That one-half of the proceeds of the sale of public lands is declared to constitute a part of the common school fund, and not subject to appropriations herein made." Act Feb. 23, 1883.

The Legislature even gives the school fund an equal division with the State University, for it says:

"The remainder of said land not to exceed 2,000,000 acres contained in the counties and territory specially mentioned by said acts (July 14, 1879, March 11, 1881, February 23, 1883), or the proceeds thereof,   *   *   * shall one-half thereof constitute a permanent endowment fund of the University,   *   *   *   and one-half thereof shall constitute a permanent endowment fund for the common free schools of this State." Act April 10, 1883, p. 71.

Then follows a re-enactment of the school law, which also carries with it that ever-lasting, never-lost, perplexing "one-half" provision of the Constitution, as follows:

"Section 1.   Be it enacted by the Legislature of the State of Texas: That the constitutional provisions for public schools are hereby appended as a part of the school law of this State."   "All funds, lands, and other property heretofore set apart and appropriated for the support of public schools; all the alternate sections of land reserved by the State out of grants heretofore made or that may hereafter be made to railroads or other corporations of any nature whatsoever; one-half of the public domain of the State; and all sums of money that may come to the State from the sale of any portion of the same, shall constitute a perpetual school fund." Act Feb. 4, 1884, p. 38.

Without further pursuit of legislation on this subject it is well to recur to the Act of 1879, disposing of the public domain in Greer County. It says:

"Section 1.   Be it enacted by the Legislature of the State of Texas: That all the vacant and unappropriated public domain embraced in the territorial limits of the county of Greer be and the same is hereby appropriated, one-half thereof for public free schools for the education of children in Texas, without reference to race or color, and the other half for the payment of the State debt.

"Section 2.   Said lands shall be surveyed and disposed of for the purpose of carrying out the provisions of this act in such manner as may hereafter be provided by law."

No railways or immigration mentioned.   The Act of 1876 granting lands to railways was yet in force, but this Legislature gave that "one-half" constitutional clause full effect in the particular territory of Greer County.   If, therefore, "railway grants" were among the "enumerated purposes" referred to by the court, and if the "one-half" clause, as it says, "was to reach and hold beyond legislative control whatever portion of the public domain remained after the execution of the enumerated purposes," then, as a logical and judicial result, this act is unconstitutional.   On this point, however, there can be no doubt, as this court has settled it to the contrary, for in the case of Day Land and Cattle Company v. The State, 68 Texas, 526, in considering the question the court used the following unambiguous language:

"In so far as the act in question appropriated one-half of the unap-

propriated land in Greer County to this [school] purpose, it only carries into effect in the particular territory the mandate of the Constitution."

A rule that would apply to Greer County should also be good as to every other county, and for the whole State as well.   So when the Legislature in 1879 adopted articles 3703 and 4031, Revised Statutes, which appropriated to the public free schools "one-half the public domain of the State," it carried into effect in the whole territory of Texas "the mandate of the Constitution."   If not, why not?   The appropriation in the one instance applied to a single county, and in the other to the whole State, without reference to counties or county boundaries.   The only difference between the two acts turns not upon principle but upon geographical limits.   The one appropriation is simply larger than the other.   If the quality of the principle is good, it ought not to be weakened by reason of the quantity to which it applied.   Really this Day case is *stare decisis* on the point involved in the one now before this court, but the opinion nowhere refers to, criticises, or overrules it.

In discussing an appropriation of part of the public domain to a county this court, at its Austin Term, 1879, said:

" She (the State) had long before set apart for one of the most important purposes for which it was her settled policy that this very domain should · be used, and to which one-half of the same under her present Constitution is unreservedly dedicated."   Fannin County v. Riddle, 51 Texas, 368.

But few if any cases in this State ever received as much attention, or were so ably argued, or had such thorough consideration, as the one that held the Act of 1879, appropriating to the schools one-half the public domain in Greer County, constitutional.   Pertinent to the issue on which the present case pends the court very aptly said:

" We are of opinion that the words 'any of the public domain' as used in the act mean the same as 'unappropriated public domain.'   Such is the sense in which these words are used in the Constitution and laws, although in some instances the words 'unappropriated' or 'vacant' are used in connection with them, as will be seen by reference to their use.

"Section 2, article 7, of the Constitution, after declaring that 'all the alternate sections of land reserved by the State out of grants heretofore made or hereafter to be made to railroads or other corporations of any nature whatsoever' shall constitute a perpetual school fund, provides that 'one-half of the public domain of the State,' among the other funds named, shall constitute a perpetual school fund.

"The alternate sections set apart to that fund were, in a general sense, public domain, but it was not thought that these lands would be embraced under the general terms 'public domain,' hence they were specifically appropriated, as they had been by former laws, and an additional grant was made to the fund of 'one-half of the public domain of the State.'   The words 'public domain' as here used, meant simply that one-half of the

public domain then unappropriated to some use by the Constitution or some precedent obligation should be so appropriated." Day Land and Cattle Co. v. The State, 68 Texas, 526.

It will be observed that the foregoing decision was not in a case between private parties, but was between the State government and a corporation, and directly involved more property rights than this one. It would seem, therefore, that the interpretation of this very clause of the Constitution thus authoritatively declared in so important a case would be accepted and regarded as conclusively correct for the guidance not only of this court but of all the departments, courts, and citizens of the State. It is now part of the law of the land; and while any judge would be excusable for acting upon his own view and understanding of the Constitution, yet that decision was upon the point involved in this case, is the highest evidence which the State has of the true meaning of it, and should be accepted as authority so long as it stands unquestioned, unreversed, and no attempt whatever is made to explain or modify it, or to show that the Constitution then was misunderstood or misapplied. Certainly this court can not set the precedent of treating so important a case as that with such indifference as not even to refer to it. What does it mean if it does not coincide with the State's contention as to the purpose of that "one-half" clause?

That opinion was by an undivided court; and also in passing upon the defendant's plea of estoppel, based on the theory that the issuance of patents and construction of the Constitution by the Governor and Land Commissioner concluded and were final as to the State's claim, the court had this to say:

"The State can not be estopped by the act of the Governor and Commissioner of the General Land Office in issuing patents to land in disregard of law. Like all other officers, their powers are defined and limited by law, and acts done in excess of the powers conferred on them are not official acts."

Without referring to this decision, or to the articles of the Revised Statutes, or to the message of the Governor, or to several of the legislative acts quoted herein, this court, in concluding its opinion now complained of, says:

"It is proper to say, in conclusion, that no disregard of any mandate of the Constitution by either the legislative or the executive departments of the State government, however often repeated or long continued, can be for one moment tolerated by the judicial department as a reason for a like disregard by that department. But when, as in this case, seven successive Legislatures have through a period of thirteen years acted upon a given construction of the Constitution; when the department entrusted with the immediate administration of the land system of the State has uniformly concurred in that construction; and when successive Governors

of the State, eminent for their patriotism and intelligence (more than one of them having served with distinguished success in this court), have approved it, we feel that nothing less than an absolute conviction that they have all been wrong would justify us in so deciding.    The duty to decide correctly was as incumbent on them as it can be on ourselves. The people who made the Constitution, with the knowledge of the construction that was being given to it, have without protestation, year after year, sent up to the capital other Legislatures to pursue the same policy. The lands have been assessed, and taxes have been demanded and received by the State, and the people, with unhesitating trust in the intelligence and honor of the State government, have bought and sold them."

In the great length of this opinion it fails to cite even a single act of the "seven successive Legislatures," or of either Governor, that in any way supports the view it takes of the Constitution; nor do the agreed facts show that "the people, with unhesitating trust in the intelligence and honor of the State government (or in any other way), have bought and sold" the lands; nor is there anything to indicate the like disclosed by the record.

As to legislative construction, investigation of the Revised Statutes and legislative acts herein cited and quoted will prove beyond doubt that this court is wrong as to its own construction, and also in the one it seems to think the other departments of the government have so long concurred in.

As to executive construction, the court is mistaken, for the reasons that all the land grants to railways under the present Constitution were received between August 16, 1876 (when the law authorizing them was passed), and April 22, 1882, the date it was repealed.

No Legislature met after the passage of that law of 1876 until in January, 1879.    During that period the record here fails to show the issuance of any patents at all, and there was no Legislature to receive a message from Hon. R. B. Hubbard, the Governor by succession.    Hence "executive construction" could not have been given by him.    On assembling of the next Legislature in January, 1879, Governor Roberts (who "sat with distinguished success in this court") delivered the inaugural address, and afterwards the message herein quoted, wherein he expressly told that body that "one-half the public domain" belonged, and should be set apart, to the public free schools.    In 1882, while he remained Governor, the law of 1876 granting lands in aid of railroads was repealed on the ground that the "public domain was exhausted," and the record here fails to show and the court does not judicially know that any patents issued during the succeeding administrations of Governors Ireland and Ross.

Then how can this court determine that more than one Governor ever gave this provision of the Constitution a construction at all?    The only one who had a reasonable or valuable opportunity to give it any construction was Governor Roberts.    Certainly he did not say, as this court holds,

"that the object of the clause granting one-half of the public domain to the school fund was to reach and hold beyond legislative control whatever portion of the public domain remained after the execution of the enumerated purposes." On the contrary, he seemed to think none of it was to be held "beyond legislative control," and told the Legislature that the Constitution imposed upon it the duty of setting apart for the public free schools "one-half the public domain of the State." In pursuance of his excellency's recommendations the Legislature passed the laws herein quoted, giving the schools "one-half" in all special instances, and adopted the Revised Statutes which, as before stated, appropriated by two different articles "one-half of the public domain" to them.

In giving effect to the Constitution a great deal of the work was left to the committee of codifiers who, between the adjournment of the Legislature of 1876 and the convening of the next one in 1879, prepared the Revised Statutes, wherein most if not all the constitutional provisions were put in force. With this explanation the court's attention is again invited to a consideration of articles 3703 and 4031 of said statutes, which were overlooked, or at least unnoticed in its opinion, with the hope that they will be explained.

Do they support the court's construction of the "one-half" clause or the one contended for by the State?

An inspection of the provisions of section 2, article 7, and other sections contained in the five Constitutions will show the unvarying clamor of the people of Texas for public schools. By the two first Constitutions they resorted exclusively to taxation as the method of raising revenue to support them. In the one of 1866 they added a contribution of part of the public domain to taxation for that purpose. The one of 1869 gave all the proceeds of sale of the public domain, one-fourth of the general revenue, and authorized local taxation without limit for the cause of education. That of 1876, with a vast domain to be disposed of, kept apace with the times in protecting most of it as a perpetual school fund. It was the first and only one that had this "one-half" clause in it.

In passing on the question here there seems to be no necessity for appealing to rules of construction to ascertain the meaning of the section of the Constitution upon which this case depends. Its words possess a natural signification; they embrace a definite meaning and involve no absurdity or contradiction in expression or import requiring the application of subtle rules to give them effect. All it has ever needed or now requires is impartial obedience and enforcement. Embodying as it does several conditional appropriations, it possesses only one absolute, positive dedication, and that is in plain English language, susceptible of only one meaning. "One-half" means one-half the world over, whether it is expressed in the past, present, or future tense. The Constitution in granting "one-half of the public domain" spoke not as to past conditions nor future

contingencies, but with reference to what then existed.    To read it as it is written in suitable divisions can produce no conflict or confusion, but will give a clearer conception of the harmony, consistency, and independence of each provision of that section:

1.    "All funds, lands, and other property heretofore set apart and appropriated for the support of public schools."

2.    "All the alternate sections of land reserved by the State out of grants heretofore made or that may hereafter be made to railroads or other corporations of any nature whatsoever."

3.    "One-half of the public domain of the State."

4.    "And all sums of money that may come to the State from the sale of any portion of the same shall constitute a perpetual school fund."

It would be impossible to convey thoughts in plainer language.

As an able writer says: "In interpreting clauses we must presume that words have been employed in their natural and ordinary meaning.    The framers of the Constitution and the people who adopted it must be understood to have employed words in their natural sense, and to have understood what they meant.    This is but saying that no forced or unnatural construction is to be put upon their language." Cool. on Const. Lim., 72.

Another said:    "My rule has ever been to follow the fundamental law as it is written, regardless of consequences.    If the law does not work well the people can amend it, and inconvenience can be borne long enough to await that process.    But if the Legislature or the courts undertake to cure defects by forced and unnatural constructions, they inflict a wound upon the Constitution which nothing can heal."    Oakley v. Aspinwall, 3 N. Y., 568.

Each of the four provisions of said section 2 is independent of the other and can stand alone.    Strike out the first, and the second is good.    Eliminate the first and second, and the third would stand.    Leave all those three out, and the last can not be affected.    Let them all remain, and consistency and harmony prevail.

Adherence to the plain words of the Constitution and statutes now in force and consideration for the unclouded intent to be found in them would give to the perpetual public free school fund of Texas, in addition to its alternate sections, one-half interest in every foot of land held by any private corporation under the State acquired since the present Constitution took effect.

Even in the result of the court's own rule by which the "one-half" clause was intended to be given effect, the school fund was greatly the loser; for the opinion says:    "This calculation leaves the school fund 5,282,153 acres short of one-half of the public domain not consumed by specified appropriations under the direction of the Constitution."    In view of this admission by the court, and of the declaration by the Legislature in 1882, when it repealed the law granting lands to railways "because the public domain

has been exhausted," it might again be pertinently asked, what does the court mean when it says, "That the object of the clause granting one-half of the public domain to the school fund was to reach and hold beyond legislative control whatever portion of the public domain remained after the execution of the enumerated purposes?"

As the school fund by the court's rule gets 5,000,000 acres less than nothing from the "one-half" clause, then it is difficult to understand what is left for that provision "to reach and hold beyond legislative control." The opinion argues that it has been ignored by the Legislatures, Executives, and Commissioners; that they have maintained a different construction from the one contended for by the State, and it advances a rule by which that clause shall be put in force.

By that rule the "one-half" clause is inoperative, useless—of no effect. The "enumerated purposes" of "railway grants," "homestead grants," the State Capitol, and University grants were not satisfied until the public domain was exhausted, according to the declaration of the Legislature in 1882, when the law authorizing aid to railways was repealed, and there was no public domain left for it to "reach and hold beyond legislative control."

In passing on another provision of the Constitution in this case (not raised by the pleadings or facts) this court says: "It ought to be given some effect rather than to make it meaningless and surplusage." According to results, has not that important "one-half" clause been made "meaningless and surplusage?" If not, has effect been given it; and if so, how and in what way? Counsel for the State can not propose an answer.

Doubtless, however, this question is effectively answered by a declaration of the court in concluding its discussion of the division on the "one-half" plan, wherein it says, "It will be conclusively presumed that through such division the school fund has acquired all of the public domain that it was entitled to under the Constitution." The right to "one-half" in the beginning is admitted, and 5,000,000 acres loss, by the court's rule, is declared in the end. The amount now to be forever settled by the conclusive presumption of the court! In behalf of justice, of every rule and principle of equality and reason, why could not such presumption be indulged in behalf of the public free school fund?

In the fountains of patriotic hearts the spirit of public education was enshrined, consecrated. From the minds of prophetic statesmen it leaped forth and took shape in the thought of Texas manhood. It was laid as a corner stone among the bed rocks of the Republic upon which the structure of a great State was to rest. Deeply set in the organic instrument that gave protection to all that were to follow, it has ever so remained unmoved, and by all admitted as the one grand foundation in which "the preservation of the liberties and rights of the people" took succor and found life. Year after year it has grown, without a graceless hand to smite

it or a rancorous breath to blight it; but now, at the threshhold of its vigorous maturity, when it demands rights under the Constitution, other claims are made paramount to its cause.

Equality, justice, law, and principles of constitutional supremacy invoke yet recognition of its pristine purity in its demands for what of right belongs to it.

Most respectfully submitted, with the confiding hope that this court will take all the time demanded by the importance of the issue to review each of the constitutional and legislative provisions and the executive and judicial interpretations herein referred to, so that what is law may be declared by an undivided bench in this case.

*L. D. Brooks, Esq.*, also filed a written argument in support of the motion.

May 2, 1890, motion overruled, Chief Justice Stayton dissenting and filing the following dissenting opinion:

STAYTON, CHIEF JUSTICE, DISSENTING.—Magnitude of the interests involved in the question decisive of this case, and the broad divergence of opinion entertained by members of this court, must furnish my reason for stating what is believed to be the true construction of those parts of the Constitution on which the decision must rest.

In construing a constitution, or any other law, the object sought is the true intent of the law maker, which must be ascertained from the language in which the law is written, and in considering this it is always important to keep in view the object which the law maker intended to accomplish through its enactment.

The more intensely the law maker may be seen to have desired to accomplish the given purpose, the more weight should be given to the language used in a law looking to that end. When it is seen that the people of a great State have persisted throughout the entire period of their statehood—in prosperity and in adversity, in peace and in war—in the accomplishment of a purpose which they have declared again and again of the utmost importance to their welfare if not to their existence; when from time to time as occasion offered they have manifested their deep concern to accomplish it by increasing the fund with which this may be done, their language used in laws looking to that end ought not to be lightly weighed.

The first section of the article of the Constitution on which the decision of this case rests declares that "A general diffusion of knowledge being essential to the preservation of the liberties and rights of the people, it shall be the duty of the Legislature of the State to establish and make suitable provision for the support and maintainance of an efficient system of public free schools."

This utterance is not new to the people of Texas. Before it became a separate nationality, in the face of an hostile army bent on subjugation, when the future was dark, the fathers of the Republic, in summing up the wrongs which drove them to seek refuge from oppression through revolution, declared that the Mexican nation had "failed to establish any public system of education, although possessed of almost boundless resources (the public domain), and although it is an axiom in political science that unless a people are educated and enlightened it is idle to expect the continuance of civil liberty or the capacity for self-government."

The same men, in the Constitution then made, declared that "it shall be the duty of Congress, as soon as circumstances will permit, to provide by law a general system of education." Const. Rep., Gen. Prov., sec. 5.

When it surrendered its nationality and entered the Union it preserved the fund now in question, and in the Constitution of 1845 first used the language found in the present Constitution before quoted. That Constitution preserved to the school fund all that had been donated by the Congress of the Republic, imposed upon the Legislature the duty "as early as practicable to establish free schools throughout the State," and "to set apart not less than one-tenth of the annual revenue of the State derivable from taxation as a perpetual fund." Art. 10, secs. 2, 4. It made other provisions in lands. The accumulation of that fund and the sources from which it came may be traced through the legislation of the period. Again came devastating war, but the purpose was never abandoned; the fund though for a time partially diverted was restored.

In 1854 the system of granting aid through alternate sections of land to railway companies began, through which the State required 16 sections of land for every mile of railway built to be surveyed for the State. This land was reserved from location, entry, or pre-emption privileges; and when the people again met in convention to remodel their organic law they repeated the declaration before quoted, secured to the perpetual school fund all funds which had theretofore belonged to it, provided for taxation for school purposes, and in addition to this declared that "all the alternate sections of land reserved by the State out of grants heretofore made or that may hereafter be made to railroad companies or other corporations of any nature whatever, for internal improvements or for the development of the wealth and resources of the State, shall be set apart as a part of the perpetual school fund of the State; provided, that if at any time hereafter any portion of the public domain of this State shall be sold, and by virtue of said sale the jurisdiction over said land shall be vested in the United States government, in such event one-half of the proceeds derived from said sale shall become a part of the perpetual school fund of the State; and the Legislature shall hereafter appropriate *one-half of the proceeds resulting from all sales* of the public lands to the perpetual school fund." Const. 1866, art. 10, secs. 1, 7. It secured

to counties the school lands theretofore granted to them, as did it secure the grants of money and lands theretofore made to found and support one or more universities.

The period of "reconstruction" came, and the Constitution of 1869 was adopted. That took from the Legislature the power to grant land to aid in the construction of railways or other like improvements, but provided that lands might be sold only to actual settlers in small quantities. In reference to education it contained the following provision:

"Section 1. It shall be the duty of the Legislature of this State to make suitable provisions for the support and maintenance of a system of public free schools for the gratuitous instruction of all inhabitants of this State between the ages of six and eighteen years."

"Section 4. The Legislature shall establish a uniform system of public free schools throughout the State."

"Section 6. As a basis for the establishment and endowment of said public free schools, *all the funds, lands, and other property heretofore set apart and appropriated or that may hereafter be set apart or appropriated for the support and maintenance of public schools shall constitute the public school fund.* And *all sums* of money that may come to this State hereafter from the sale of *any portion* of the *public domain* of the State of Texas shall also constitute a part of the public school fund. And the Legislature shall appropriate *all the proceeds resulting from sales of public lands of this State* to such public school fund. And the Legislature shall set apart for the benefit of public schools one-fourth of the annual revenue derivable from general taxation, and shall also cause to be levied and collected an annual poll tax of $1 on all male persons in this State between the ages of twenty-one and sixty years for the benefit of public schools. And said fund and the income derived therefrom and the taxes therein provided for school purposes shall be a perpetual fund, to be applied as needed exclusively for the education of all the scholastic inhabitants of this State, and no law shall ever be made appropriating such fund for any other use or purpose whatever."

It attempted to place the lands theretofore given to counties for school purposes under the control of the Legislature, the proceeds to be added to the public school fund, and further provided for local taxation for support of schools if found necessary.

By amendment to that Constitution the policy in reference to grants of land in aid of internal improvements was changed on March 19, 1873, but the day before the amendment took effect the Legislature set apart one-half of the public domain for the support of public schools. The act by which this was done evidently was prompted by the anticipation that lands would be appropriated to works of internal improvement, and secured to the school fund alternate surveys to be made under certificates theretofore or thereafter to be issued, and seems to have looked to that

method for securing the one-half then appropriated. Gen. Laws 1873, p. 15.

After the amendment of the Constitution last referred to no general law was passed granting land to aid in the construction of railways until the Act of August 16, 1876 (Gen. Laws, p. 153), though after that amendment such aid was given in special laws contained in charters before the passage of the act last referred to, but grants were made in alternate sections as required by the Act of March 18, 1873, as well as by the Act of August 16, 1876.

Legislation from January 26, 1839, to the adoption of the present Constitution manifested the same deep interest in the cause of free public education shown in the organic laws to which reference has been made; and in view of this persistent and unfaltering purpose, not manifested for any other objects, must be read the language found in the present Constitution. Section 2, article 7, and so much of sections 4 and 5 of the Constitution as have bearing on the question involved in this case are as follows:

"Section 2. All funds, lands, and other property heretofore appropriated for the support of public schools; all the alternate sections of land reserved by the State out of grants heretofore made or that may hereafter be made to railroads or other corporations of any nature whatsoever; one-half of the public domain of the State; and all sums of money that may come to the State from the sale of any portion of the same, shall constitute a perpetual school fund."

"Section 4. The lands *herein set apart* to the public free school fund shall be sold under such regulations, at such times, and on such terms as may be prescribed by law; and the Legislature shall not have power to grant any release to the purchasers thereof."

"Section 5. The principal of all bonds and other funds and the principal arising from the sale of the *lands hereinbefore set apart* for said school fund shall be the permanent school fund; and all the interest derivable therefrom and the taxes herein authorized and levied shall be the available school fund, which shall be applied annually to the support of the public free schools. And no law shall ever be passed appropriating any part of the permanent or available school fund to any other purpose whatever; nor shall the same or any part thereof ever be appropriated to or used for the support of any sectarian school; and the available school fund herein provided shall be distributed to the several counties according to their scholastic population, and applied in manner as may be provided by law."

On the interpretation of section 2 rests the right of the parties, and in seeking for that we must look to the language used, remembering that the intent to be ascertained is that of the people who ratified the Constitution. As has been truly said, "it is not to be supposed that they have

looked for any dark or abstruse meaning in the words employed, but rather that they have accepted them in the sense most obvious to the common understanding and ratified the instrument in the belief that that was the sense designed to be conveyed." Cool. on Const. Lim., 80.

Courts are not at liberty to speculate as to what the people would have done under any given state of facts when called upon to construe a constitution, but are bound to ascertain what they did—what they intended to do—and this from the language used in making known their intention. That ascertained, the only remaining duty is to give effect to that intention.

It is not claimed that there is a conflict real or seeming between the section of the Constitution in question and any other, and the sole inquiry is, what lands did the language used appropriate to and make a part of the perpetual or permanent school fund?

The first inquiry arising is, does this section make an appropriation of the several sources of revenue named in it?

A fund or property is said to be appropriated when it is reserved or destined by law for a particular named use or purpose.

The declaration that the specified funds together "shall constitute a perpetual school fund" of itself leaves no doubt upon this question; for the word "constitute" as here used is the equivalent of the words "compose," "make up," "be," the unit composed of the several constituents, which it is declared shall be perpetual, continuing indefinitely, without cessation or interruption by any department of the government, and subject to diversion only by the will of the people which may be expressed in some future organic law.

All the lands referred to in the several clauses of section 2 are the same in their entirety as the lands referred to in sections 4 and 5—nothing left out or added. These last sections speak of these lands as "*the lands set apart to the public school fund*," and declare that "the principal of all bonds and other funds and the principal arising from *the sale of the lands hereinbefore set apart to said school fund shall be the permanent school fund*."

As if to place this question beyond controversy, then follows the declaration that "no law shall ever be enacted *appropriating any part* of the permanent or available school fund to any *other purpose whatever*."

Property thus *set apart* as a permanent or perpetual fund for a named use, with power denied to the Legislature ever to divert it from that use, is appropriated as absolutely as the people had power to appropriate. No more apt words could have been used to declare an appropriation than are used in sections 2, 4, and 5 of article 7, and it ought not to be assumed that the people did not understand the meaning of the vernacular, in no manner technical, used by themselves.

The question of appropriation will be more closely considered in other connections.

If the Constitution appropriates to the school fund each of the items which make up the aggregate denominated in section 2 the "perpetual school fund," when did that appropriation take effect? To this inquiry there can be but one answer. The people declared that the Constitution should become the law of the land on April 18, 1876, and from the moment it so became its provisions were binding upon the people and upon every department of the government alike, and must so continue until changed by the people themselves.

The opinion of the majority is understood to hold that sections 2, 4, and 5 of article 7 are not self-executing. Section 1 of that article makes it the duty of the Legislature to establish and make suitable provision for the support of an efficient system of public free schools, and while this is mandatory it is not self-executing. It rests with the Legislature to determine what the system shall be, and to provide for realizing from what is termed the *perpetual* fund an *available* fund and for the manner of its use. As to the system and best means for the conduct and support of the schools contemplated by the Constitution, much is left to the discretion of the Legislature. Without legislation on these subjects no system could exist, the Constitution having established none; nor could an *available* fund arise from the fund termed *perpetual* for the support and maintenance of any system of public free schools. In so far the Constitution is not self-executing.

It may be further conceded that, in a limited sense, so much of section 2 of article 7 as made alternate sections out of grants made to railroads or other corporations after the adoption of the Constitution a part of the *perpetual* fund was dependent on the action of the Legislature. No general law existed when the Constitution was adopted giving land to aid in the construction of railroads or other corporate enterprises. Whether such laws should be enacted depended upon the will of succeeding Legislatures, the Constitution not commanding the passage of such laws. In so far the appropriation made by the Constitution depended on a contingency, in that it rested on the will of the Legislature.

If, after the Constitution was adopted, no lands had been granted to railroads or other corporations, there would have been no "alternate sections of land * * * out of grants * * * that may be hereafter made" to become a part of the perpetual school fund. In this respect the Constitution did not absolutely secure to the perpetual school fund, by force of its own provisions alone, a single acre of land; but it does not follow from this that even as to such lands it is not self-executing.

Both parties to this appeal concede that the alternates of the sections of land in controversy belong to the school fund; and so simply because the Constitution declares they shall so belong. This is not by force of any act of the Legislature, but solely by reason of the self-executing provision of the Constitution which attaches whenever such grants are made.

This being concededly true of the only item of the appropriation which had in it any element of uncertainty, where is to be found a secure resting place for the proposition that any part of section 2 of article 7 of the Constitution is not self-executing, in so far that it binds every item that makes up the aggregate fund to it with chains so strong that neither one nor all the co-ordinate departments of the government can rend them. All other clauses of that section are absolutely self-executing in every sense having relation to the fact of appropriation, unless the power of the people to appropriate can be successfully denied.

If the Legislature had not established a system of public free schools, or should now repeal all laws in force providing for their establishment and management, or for realizing from the perpetual fund an available fund for annual use, the perpetual or permanent fund appropriated and put beyond the reach of the Legislature for purposes of destruction or diversion would continue to exist; and this would result solely from the fact that every one of the clauses of the appropriating sections are self-executing.

The act of appropriating this fund and placing it beyond the power of the Legislature to divert or destroy it is an instance of the exercise of a power by the people directly, completely, and absolutely in regard to a matter which might have been left to the Legislature; and the fact that they did this ought to be deemed of itself the strongest evidence of the intent of the people to make the law self-executing if the language in which the intent to appropriate is found left the question not free from doubt. The language used, however, bears no uncertain meaning unless we deny to the words used their ordinary and most obvious signification.

The instance before us is one in which the people exercised their own power, in so far as it was deemed expedient, to firmly and broadly lay the foundation and furnish the means to erect, through details to be provided by the Legislature, a structure to last for ages. Such provisions in a Constitution are self-executing necessarily in so far as they determine and fix the fund with which public schools are to be maintained, for they deprive every department of the government of all power to diminish or to divert it.

The sections of the Constitution having direct bearing on the question involved in this case do not merely indicate a policy or announce a principle, nor are they advisory in character. They declare a right, give its measure, the subject matter to which it attaches, and assert it to be perpetual, and where this state of facts is found to exist the law which brings it into being is necessarily self-executing.

Several sections of the Constitution not bearing directly on the question involved in this case, but affecting the lands of the State, have been appealed to for the purpose of giving strength to the propositions that these in question do not make an absolute appropriation and are not self-executing, and these will be briefly noticed, for every provision of the

Constitution having even a remote bearing is entitled to a candid consideration and to be given full weight in the search for truth and right. It has been suggested that if the people had intended to make the sections of the Constitution in question self-executing, and through them to make an absolute appropriation of all the lands specified in section 2, some such language would have been used as is found in section 6 of the same article. That section has application to county school lands, and declares that lands theretofore or thereafter to be granted to the several counties for educational purposes "are of right the property of said counties respectively to which they were granted, and title thereto is vested in said counties." This language was not necessary to appropriation, and could not with propriety have been used in relation to lands which were to continue the property of the State until sold to individuals.

The earliest grants of land for educational purposes were made to counties in pursuance of the policy foreshadowed by the Constitution of the Republic. Acts Jan. 26, 1839, and of Jan. 16, 1850, Pasch. Dig., arts. 3464–3476.

The location and survey of these lands were paid for by the several counties, in whose ownership they remained without question until the adoption of the Constitution of 1869, whereby an effort was made to destroy the counties' ownership, and to make the proceeds of such lands a part of the public school fund. Const. 1869, sec. 8, art. 9. In Milam County v. Bateman, 54 Texas, 153, that section of the Constitution was held inoperative because to give it effect would destroy vested rights.

That decision, however, had not been made when the present Constitution was adopted, and the language quoted from section 6, article 7, was doubtless inserted for the purpose of restoring to the several counties the lands which it was thought were taken from them by the former Constitution, or for the purpose of removing any doubt cast upon the title of the counties by that instrument. This was its purpose, and that language used to manifest that intent is not found in the section in question, where it was not needed and would have been inappropriate, can not diminish the force of the words found.

The language of section 15, article 7, which makes, as all concede, an absolute appropriation of land for the University, is not more imperative and does not more clearly evidence an intent that it shall be self-executing than do sections 2, 4, and 5 of the same article in so far as they make or recognize an appropriation.

In the one case as in the other the lands are declared to be "set apart." In respect to the University lands, however, it was declared that these should in part consist of lands "to be designated and surveyed as may be provided by law." The appropriation was absolute without the words quoted, for no one would seriously contend that the Constitution did not secure to the University the number of acres named, and thus withdrew

from the Legislature the power to defeat its right to them or to grant to others so much of the public lands as would defeat the University's right.

The appropriation for the University, even with an express declaration that the land appropriated should be designated, was less certain than was the appropriation of "one-half of the public domain of the State;" and the language found in section 16, article 7, can not with propriety be invoked to sustain the proposition that the appropriation for the University was absolute, but that for public schools embraced within the words "one-half of the public domain" was not intended to be so, nor to support the proposition that the one provision was self-executing and the other not. This is especially true in view of the fact that the Constitution commanded the Legislature to "pass such laws as may be necessary to carry into effect the provisions of this Constitution. Art. 3, sec. 42. In the one case as in the other, segregation was necessary to designate the particular lands appropriated *before they could be sold*, but the appropriation in neither case depended on that.

Section 57, article 16, of the Constitution provided that "three millions acres of the public domain are hereby appropriated and set apart for the purpose of erecting a new State Capitol and other necessary public buildings at the seat of government, said lands to be sold under the direction of the Legislature; and the Legislature shall pass suitable laws to carry this section into effect."

This language is no more emphatic than that found in the sections bearing on the question before us. Each in terms proposes to *set apart* lands for a particular purpose, and requires legislation to carry out the purposes for which appropriations were made. They all relate to lands *set apart* for named purposes, which it was known must be sold to realize means for carrying out the purposes contemplated. With a view to sales it was necessary that the appropriated lands should be segregated; but this was not necessary to the appropriation unless it be true that the people had not power to appropriate an undivided part of the public domain. To that point must those go who deny that the sections of the Constitution in question are not self-executing and do not absolutely appropriate a part of the public domain.

That the people through section 2, article 7, of the Constitution made some appropriation absolutely to the public free school fund neither party denies, and the vital question in the case is, what did the people thus appropriate?

That section enumerates in a general way the several items which make up what is therein termed the *"perpetual school fund."*

Section 5 of same article terms the interest-bearing securities on hand and to be acquired with the proceeds of the sales of lands appropriated by section 2 the *"permanent school fund."*

The words "perpetual" and "permanent" have practically the same

signification, and the basis for the entire fund is found in section 2, for none other makes appropriation to that fund. The word "fund" as here used means the entire property from which money is to be derived for the maintenance of public free schools—the foundation on which rests the support of the system of schools which it is made the duty of the Legislature to establish and maintain. Each clause of section 2 makes an appropriation complete within itself when considered with its necessary connections, the one not dependent upon the other, and together constituting an aggregate which the people have declared shall constitute a perpetual, permanent fund. Looked to as an entirety, the section seems to be too clear to justify construction; if separated into its parts the same conclusion must be reached, unless we deny to words their most obvious and usual meaning. The first clause of the section with its necessary connection will read as follows: "All funds, lands, and other property heretofore set apart and appropriated for the support of public schools shall constitute [part of] a perpetual school fund."

Looking to laws in force when the Constitution was adopted we readily perceive what funds passed by this clause of the section, the purpose of which was to preserve existing appropriations. Neither party denies that the fund covered by this clause was absolutely appropriated, nor is it claimed that legislation was necessary to give effect to it.

The second clause of the section, with its necessary connections, will read, "all the alternate sections of land reserved by the State out of grants heretofore made or that may be hereafter made to railroads or other corporations of any nature whatsoever shall constitute [part of] a perpetual school fund." It is not denied that this clause made an absolute appropriation of the lands embraced in it, nor can there be ground for claim that legislation was necessary to the appropriation, even though the extent of the appropriation made by the last division of the clause was dependent on legislation and the acts of corporations thereunder to some extent.

The application of the first division of the clause is clear, and thereby it was intended to preserve and continue appropriations made by section 3, article 10, of the Constitution of 1866, continued by section 6, article 9, of the Constitution of 1869, as well as to preserve appropriations made by the Act of March 18, 1873.

The second division of this clause has application to alternate sections to be located after the Constitution took effect, by railway companies or other corporations, on certificates issued before or after that date, and if dissevered from its immediate associate, with its necessary connections, will read, "all the alternate sections of land reserved by the State out of grants * * * that may hereafter be made to railroads or other corporations of any nature whatsoever * * * shall constitute [part of] a perpetual school fund."

The third clause of the section, with its necessary connections, will read, "one-half of the public domain of the State  *  *  *  shall constitute [part of] a perpetual school fund."

My brother who wrote the opinion of the majority, in construing the fourth clause of the section, asserts a proposition calculated to cast doubt on the unity of purpose of every clause contained in it, which in this connection it is proper to notice.   That clause provides that "all sums of money that may come to the State from the sale of any portion of the *same* shall constitute [part of] a perpetual school fund."

It is suggested that this appropriated all proceeds of sales of public domain to the school fund, and that it did not merely appropriate the proceeds of land appropriated to that fund.   This clause, manifestly, has reference only to lands or other property which had been appropriated by preceding clauses of the same section, and the purpose of its insertion evidently was to leave no doubt that money to be realized from the sale of appropriated property should be considered as fully appropriated to the perpetual school fund as was the property from which it was to be derived. The word *same* used in the clause doubtless refers only to property by that section appropriated to the perpetual school fund.

This is its obvious construction, without reference to any other section of the Constitution; but if there could be doubt as to this it is removed by a consideration of the fifth section of the same article, which, with the fourth, may not have been given in the disposition of this case that weight that should have been in construing the second section.

The fifth section declares that "the principal of all bonds and other funds and the *principal arising from the sale of the lands hereinbefore set apart* for said school fund *shall be the permanent school fund,* and all the interest derivable therefrom and all the taxes herein authorized and levied *shall be the available fund,* which shall be applied annually to the support of the public free schools."

There are but two classes of school funds recognized by the Constitution, and it declares of what these shall consist.   One is the *available fund,* and the sources from which it is to be derived are declared by the Constitution. The principal of moneys derived from the sale of lands is not one of these sources.

The other is the fund termed *"perpetual"* and *"permanent,"* and in so far as it consists of proceeds of sale of lands is restricted to the *"principal* arising from the sale of lands *hereinbefore set apart* for said school fund."   The lands referred to as lands *hereinbefore set apart* are the lands appropriated by section 2, for no other part of the Constitution undertakes to appropriate lands to the perpetual public free school fund.

Whether the Legislature might make other appropriations it is not now necessary to consider, there being no prohibition of such legislation, for the question now is, what did the Constitution appropriate?

Appropriations made by the first, second, and third clauses of section 2 are clearly cumulative, whether the construction of the one or the other party be placed upon them; appropriation made by one clause is in no manner made dependent on another, and at the time the Constitution was adopted the first, third, and first division of the second clause had application to things certain, then existing, and easily identified.   As to them, the appropriation was as absolute as words most apt could make it, and the fact that no specific half of the public domain was appropriated ought not to defeat the intent of the people so clearly expressed.   They knew that there had been no division of lands subject to the third clause into two parts when the Constitntion was adopted, and with reference to the state of fact then existing made the appropriation, which then necessarily vested an undivided interest.

It must be conceded that this was done with expectation that the Legislature would in some proper method segregate that part of the public domain appropriated to the school fund from that which should remain subject to appropriation by outstanding certificates, other valid claims thereafter to arise, or to such disposition as the Legislature might lawfully make of it.   The power of the people to make such an appropriation can not be denied.   The language used by them in doing this in a contract between individuals would receive but one construction.

A distinguished author truly said that "Every word employed in the Constitution is to be expounded in its plain, obvious, and common sense, unless the context furnishes some ground to control, qualify, or enlarge it.   Constitutions are not designed for metaphysical or logical subtleties, for niceties of expression, for critical propriety, for elaborate shades of meaning, or for the exercise of philosophical or judicial research.   They are instruments of a practical nature, founded on the common business of human life, adapted to common wants, designed for common use, and fitted for common understandings.   The people make them, the people adopt them, the people must be supposed to read them with the help of common sense, and can not be presumed to admit in them any recondite meaning or any extraordinary gloss."   Story on Const., 451.

Apply these rules to the declaration "that one-half of the public domain of the State shall constitute [part of] a perpetual school fund," and what intent or meaning can be drawn from them other than that the people intended absolutely to appropriate one-half of the unappropriated public domain to the school fund?

Where can be found in the context anything to require or justify a different meaning to be attributed to them than that which the words in their ordinary use convey?

The immediate context and the entire Constitution may be searched in vain for anything to justify varying their import.

If we are to indulge in speculation and conjecture to find reasons why

the people did not intend what their words import, then constitutions will cease to be safeguards to rights of persons or property. As before said, the Constitution took effect in all its parts the very moment the people declared it should, and the appropriation of the then one-half of the otherwise unappropriated public domain became as absolute as it ever could. Any other proposition must be based on the theory that the people had not the power to appropriate one-half of an undivided whole, or that the failure of the Legislature to make the segregation would defeat the clearly expressed will of the people. What the Legislature could not do by an affirmative act could not be accomplished by its mere failure to act at all.

It is contended by appellant that the words "one-half of the public domain of the State," used in the third clause, were intended only to embrace lands remaining, if any, after railroads and other corporations had received in alternate surveys what lands they might take; "that the expression 'public domain of the State' was not meant to embrace lands thereafter taken up under the law granting lands to railroads;" and the further proposition is made that "it was only through the operation of the law concerning grants to railroads and its practical application to the public domain that the school fund could receive any land under it. If the railroad got no land, the school fund could get none."

It is certainly true that it was not intended that the appropriation made by the third clause of section 2 should embrace lands to be thereafter taken up under laws granting lands to railroads and other corporations in alternate surveys, but it does not follow from this that such corporations could thus appropriate any lands appropriated by that clause to the school fund. The proposition that it was only some remainder which might be found to exist at some future time, after railroads and other corporations had acquired through alternate surveys all the lands they desired or were permitted by the Legislature to take, to which that clause of the Constitution could have application finds recognition in the opinion of the majority, as does the further proposition that it was intended partition should be made only through the grant of lands to corporations through alternate surveys. The fallacy of both these propositions is evident from several considerations.

The proposition that the appropriation only applies to an uncertain remainder, to be ascertained at some future time after corporations had acquired all the lands they desired or that the Legislature would permit them to take, assumes that the Constitution does not deal with the public domain at the moment it became the law of the land, when there is nothing in the language of that instrument to justify such an assumption. It must be admitted that the people intended to place something denominated "one-half of the public domain" in the school fund, and to de-

prive the Legislature of the power to appropriate this something to any other use.

If by the words is not meant one of two equal parts of the whole public domain not otherwise appropriated by the Constitution, it must mean something termed the "residue" or "remainder," which simply means that left after a part is taken away. The remainder of one-half in the nature of things can not be equal to it. The word involves the idea of diminution, which can not exist unless some larger standard is once fixed, nor can diminution be made without a power to make it.

The words of the Constitution leave no doubt of the intent of the people to fix the measure of the appropriation made by the third clause at one-half of the public domain; and we must concede that they did so fix it with reference to the area of public domain existing unappropriated until this was done by the Constitution, or that they left its area to be determined by the Legislature at some future time, after a part of it had been appropriated by that body or with its consent to some use to which the people did not appropriate it through the Constitution. If the first proposition be granted all controversy must cease, for the Constitution declares that the Legislature shall not appropriate to other use that which the people through it appropriated to the school fund. If the last proposition be correct, then we are forced to the conclusion that the people made no appropriation at all when they declared that one-half of the public domain should constitute a part of the school fund; but this conclusion is not contended for, and it is admitted that the people did thus appropriate something that the Legislature could not take away.

This brings us to the question whether power was left in the Legislature to determine what this remainder—this something called in the Constitution "one-half of the public domain"—should be; for if it be conceded that the Legislature had such power, then it is too clear that it was clothed with power to declare that no part of the public domain should pass to the school fund by the third clause of the section under the words "one-half of the public domain." It must be remembered that no part of the Constitution required the Legislature to permit corporations or individuals to acquire lands through the alternate system except as this may have been done by the recognition of such claims then existing. In fact, it was left wholly to the discretion of the Legislature whether any lands should be granted to corporations except under claims existing when the Constitution was adopted and recognized by it; and it is evident that with reluctance the people left this power in the hands of the Legislature to be exercised in some cases only under prescribed restrictions.

From this it necessarily follows that the Legislature had power to refuse to grant lands in alternate sections, whereby, in so far, one-half of the public domain would enure to the school fund, as it is claimed was intended under the second branch of the second clause. In so far, then, the

Legislature had power to refuse to secure to the school fund through alternate surveys under grants to corporations any lands whatever, and could thus defeat not only the method of partition claimed to have been intended, but also the acquisition of one-half of the public domain through such survey. If the Legislature pursued that course—and in considering its power it is not necessary to inquire what it did, but what it had power to do—it may be said that the State would still own the land, and therefore one-half of the public domain could be set apart to the school fund without reference to the alternate surveys.

That is all true; but it must again be remembered that the Constitution entitles actual settlers to land, and leaves it in the power of the Legislature to make other uses of public domain without limit, subject only to the specific appropriations made or rights recognized in the Constitution.

It must further be remembered that no period is fixed when grants to settlers shall cease, but on the contrary the rights of such persons are recognized to exist so long as unappropriated land exists; and the Constitution imposes no limit or point of time within which the Legislature may make appropriation of land to any purpose not forbidden; nor does it limit the extent of such appropriation except as this is done through appropriations made by the people themselves.

Thus it will be seen, if the contention of appellant that the Constitution does not appropriate one-half of the public domain as it was at the time the Constitution was adopted is correct, that there is nothing to withdraw from the Legislature the power to hold open to actual settlers or other use every foot of public land for all time to come, which is not taken up by lawful claim, and the school fund thus be denied any part of the public domain under the third clause of the section in question, unless perchance some lands might be received through the second branch of the second clause, and thus become chargeable to the one-half of the public domain, as is contended would be the case. The existence of such a power in the Legislature with any vested right of the school fund to anything under the grant of one-half of the public domain, whatever the extent of that may be, is impossible; for it would be a power to destroy the grant, which is expressly denied to the Legislature—or, what is the same thing, to deny that the time had come when the residue to be held beyond legislative control was ascertained, or should be.

The proposition that the words "one-half of the public domain" are not to be given their ordinary meaning does violence to every recognized canon of construction applicable, for there is no word in the entire section which shows the slightest intention to limit the meaning of these words to less than one of two equal parts of the whole unappropriated otherwise than by the Constitution.

To make these words mean some residue of the public domain existing at some time after the adoption of the Constitution, when part had been

granted away, is to make them mean something not expressed by any word used in the appropriating section.

The rule applicable here is, *that "effect is to be given if possible to the whole instrument,* and to every section and clause.   If different portions seem to conflict the courts must harmonize them if practicable, and must lean in favor of the construction that will render every word operative rather than one which may make some words idle and nugatory." Cool. on Const. Lim., 70.

That there is even a seeming conflict between any of the clauses of the Constitution on which the decision of this case must rest can not be successfully asserted, nor is it understood to be.   But the proposition, in effect, is made that the second branch of the second clause of the section in question does not appropriate any land not embraced in the third clause; that the two together only appropriate one-half of the public domain not otherwise appropriated by the Constitution.   If this was the intention, why the declaration that "all the alternate sections of land reserved to the State out of grants   *   *   *   that may hereafter be made   *   *   * shall constitute [part of] a perpetual school fund," when the declaration that "one-half of the public domain of the State   *   *   *   shall constitute [part of] a perpetual school fund" would accomplish all that was intended by both?   No good reason can be given for the insertion of the two other than that the people intended to appropriate all the lands that would be embraced in both—that the appropriation should be cumulative; and in the absence of an insufficient public domain to satisfy both and all other appropriations, there is no reason for placing on the words used by the people a meaning which neither their ordinary import nor the context justifies.   If it had been intended that through alternate grants thereafter to be made to corporations one-half of the public domain should be secured to the school fund, it is incomprehensible why the people did not at least provide that such grants should be made instead of simply not denying the power to grant lands to corporations.

One-half of the public domain, however, could not have been segregated for the school fund through alternate grants to corporations unless there had been no other recognized claims for land; for under such grants the school fund would receive no more land than the corporations, which demonstrates the fact that it was not intended through such grants to secure to the school fund lands other than those it was entitled to receive under the clause appropriating alternate surveys to be made, and tends strongly further to establish that the appropriations were intended to be cumulative.

The proposition that it was intended to appropriate a part of the public domain to the school fund only in event lands were subsequently granted to corporations in alternate surveys does not require consideration.   The Constitution revived land certificates barred by the former Constitution,

and provides that "all unsatisfied genuine land certificates now in existence shall be surveyed and returned to the General Land Office within five years after the adoption of this Constitution or be forever barred; *and all* genuine land certificates hereafter issued by the State shall be surveyed and returned to the General Land Office within five years after issuance or be forever barred; *provided,* that all genuine land certificates heretofore or hereafter issued shall be located, surveyed, or patented only upon vacant and unappropriated public domain, and not upon any land titled or equitably owned," etc.   Const., art. 14, sec. 2.   Section 6 of same article provides for homestead donations both to families and single men.

An argument is based on these provisions of the Constitution against the proposition that by the terms of the Constitution one-half of the public domain not otherwise appropriated by it was appropriated to the school fund in addition to alternate sections thereafter to be granted.   The argument is that if such an appropriation was made, until the school lands were segregated it was unlawful for the holder of a valid land claim or an actual settler to locate lands, because his act would be in violation of so much of the Constitution as forbids the location of appropriated lands; and that while he was thus prevented from exercising his right, time would destroy it altogether, without his fault.   It is said that the people never intended that such a state of affairs should exist, and that therefore they did not intend to appropriate absolutely one-half the public domain to the school fund by the clause in question.   It must be conceded that the people never contemplated that there should be any unreasonable delay in the segregation of the school lands, nor that persons or corporations having valid claims for land should for an unreasonable time be delayed in realizing on them or have them destroyed by lapse of time without their fault. The Legislature, however, had ample power, which it was commanded to exercise, to prevent the occurrence of any such state of affairs; and when we come to inquire as to the intent of the people as expressed in language found in a constitution, we ought not to look for that from the standpoint of after events which the people had no reason to expect would occur.

It does not necessarily follow because the Constitution requires land certificates to be located only on unappropriated lands, that locations made on lands in which the school fund has an undivided interest would be void except as to that interest.   But if for the purposes of this case it be conceded that all locations made on lands so situated are absolutely void, it is not seen that this would better the position of appellant in the matter of construction.   The power of the people to appropriate one-half of the public domain to the school fund, and to withhold the balance from location until that should be segregated, can not be questioned. Certificates revived by the Constitution or issued after its adoption certainly took their existence and their owners' rights in subordination to all the provisions of that instrument.   Those holding valid claims when

the Constitution was adopted, even if they had vested rights which the people could not destroy, would have had no ground for complaint because of the appropriations made by the Constitution, for there was more land than was necessary to satisfy all such claims, as well as all the appropriations. If such delay in segregation continued that certificates would be barred under the terms of the Constitution before they could be located and returned to the General Land Office, this would not annul the Constitution. Segregation would not have been difficult, though it might have involved some expense.

If the Legislature had segregated the school lands in solid bodies it is not seen that there could have been any constitutional objection to that course, for the remaining lands left subject to the claims of all having valid claims for land could not be deemed a "reservation of any part of the public domain for the purpose of satisfying" grants to railway companies, which the Constitution forbade. Const., art. 14, sec. 3.

The Legislature might have required all certificates or claims for land entitled under the general law to be located as headrights were to be located with alternate surveys for the school fund, as it will be hereafter seen was done in reference to homestead donations in one instance by the first Legislature that met after the adoption of the Constitution. Thus in so far would the school fund have received one-half of the public domain.

When certificates required to be surveyed with alternate sections were surveyed the Legislature might have required four sections to be surveyed under each certificate instead of two, one of them to belong to the corporation or person owning the certificate and three to the school fund. This would have secured to the school fund, in so far, all the State claims under both clauses of the section in question, and segregation could have gone on without interruption or hurtful delay. If necessary, the increased expense of this surveying could have been provided for by the State.

When the Legislature had ample power to have thus or otherwise made the segregation, and when the people must be supposed to have intended this to be done, and even went further and declared that "the Legislature shall pass such laws as may be necessary to carry into effect the provisions of this Constitution," what is the argument last noted worth on the matter of construction? That the Legislature may not have done all that ought to have been done, and what the people expected and commanded to be done, can have no bearing on the question of their intent to make or not to make the appropriations claimed by the State to have been made. To ascertain the intention of the people we must look to the language used by them to make their intent known—must look to the subject matter to which the intention relates, and may look to all contemporaneous facts; but the future action of the people's representatives

or their failure to act is entitled to but little weight on the question of the people's intention.

If it be conceded that appropriations to the school fund were made as claimed by the State, and if it be further conceded that for want of segregation of the school lands no land in the State since the adoption of the Constitution has been in such condition that valid locations and surveys could be made by persons or corporations holding valid land claims, even then it could not be held that the appropriations made by the people were not valid and entitled to full recognition by every department of the government. To hold otherwise would be to assert that by failure to enact necessary laws to enable persons fully to enjoy their rights the Legislature could annul a provision of the Constitution. If injuries to legal rights have resulted to individuals or corporations from failures of such character, then it may be that those so injured have claims on the people that in honor and conscience they are bound to recognize; but neither the Constitution nor appropriations legally made through it can be thus annulled. Whether any such rights may possibly exist, it is neither necessary nor proper now to consider.

If under the plain language of the Constitution there could be reasonable doubt as to its true interpretation, it would be proper to look to the contemporaneous construction placed on it by the different departments of the government; and, while believing that there is no reasonable room for doubt in this respect, as an appeal has been made to this source for light, for confirmation of the intent of the people expressed in clear language used in the instrument, a brief examination of the utterances and acts of the several departments since the Constitution was adopted will be made. This will assist us in the further inquiry whether the Legislature has made or attempted to make a complete segregation of the lands appropriated to the school fund by the people, for if that department has made such a segregration the division ought to be deemed final, however unequal it may be. The first Legislature that met after the adoption of the Constitution passed two acts which have some bearing on the question.

Reciting that there was no law in force giving aid in construction of railroads, the Legislature on August 16, 1876, provided that such companies should receive aid through donations of land out of any of the *unappropriated* lands of the State, but the law required that "surveys shall be made in alternate sections or half sections, as nearly square as practicable, one section for the company and one for the State for the benefit of the public school fund." Gen. Laws 1876, p. 153.

By an act approved on the next day all reservations of public domain for the benefit of railroad companies which had lapsed or should thereafter lapse were declared to be severed from the mass of the public domain and to be reserved from location "except the 3,000,000 of acres of land reserved for constructing a new State Capitol and other public buildings,

and to actual settlers under the pre-emption laws of this State; and whenever a pre-emption survey of 160 acres or of 80 acres shall be made for any settler, a like quantity shall be made adjoining said pre-emption survey for the public free school fund of Texas.   The settler having the pre-emption survey made shall pay to the surveyor the fees for both the pre-emption survey and the one for the school fund, and also the fees for recording the field notes of both surveys, and said field notes shall be returned to the General Land Office together." Gen. Laws 1876, p. 168.

The last act can not be read without recognition of the fact that the Legislature had in mind, when it passed, the provision of the Constitution which in terms appropriated one-half of the public domain to the school fund, recognized its binding force, and in so far intended to comply with it in the enactment of this law, wherein the burden of segregation even was placed on a class usually favored above all others in the grant of lands.   It evidences further that the Legislature did not understand that the "one-half of the public domain" appropriated was some indefinite remainder that might exist at some future time after parts not appropriated by the Constitution had been applied to other uses, but that the appropriation was of one-half of the public domain not otherwise appropriated by the Constitution, which it was the duty of the Legislature to segregate and to protect in its entirety.   This was the work of a Legislature that began its session on the day the Constitution took effect, and with the will of the people freshly impressed on the minds of its members, who then understood the time had arrived when the appropriation was complete and the duty to segregate a present duty.

The one act evidences an intention to give immediate obedience to the clause of the section in question which appropriated one-half of the public domain to the school fund, and to the other provision which commanded all necessary legislation, while the other manifests an intent to exercise the power left in the hands of the Legislature under the limitations therein placed, and together they negative any understanding on the part of the Legislature that the one clause was but the means for carrying out the other.   The Act of August 16, 1876, is the sole act under which railway companies became entitled to receive lands, and if it be conceded that the Legislature may have been of opinion that locations made under it would entitle such companies to one of the sections thus located, then we have the inquiry whether this conclusion could override the Constitution and enable them to acquire lands appropriated to another purpose.   That inquiry can be answered in but one way, unless we are prepared to admit that the Legislature has power indirectly to annul the Constitution.   Lands appropriated to the school fund not having been segregated when that act was passed, it ought to be conceded that the Legislature was of opinion that without that valid surveys might be made in alternate sections under the act; but this neither affects the question

of the extent of appropriation understood by the Legislature to have been made by the people to the school fund nor impairs the appropriation. The Constitution appropriated 3,000,000 acres of land for the building of a new State Capitol. Const., art. 16, sec. 57. By an act approved February 20, 1879, lands within certain counties were reserved for this purpose, and a survey of 3,050,000 acres within the reservation was directed as a preliminary step looking to its use.

It will be seen that this survey embraced 50,000 acres in excess of the appropriation for building the Capitol; and as to this the Legislature declared that "one-half of the amount realized from the sale of the first 50,000 acres of land sold under this act shall be deposited *in the treasury of the State to the credit of the common school fund.*"

Why this scrupulous care on the part of the Legislature to preserve to the school fund *one-half* of the proceeds of the land in excess of the appropriation for building the Capitol? The only answer that can be given is that the Legislature recognized the fact that it was directing the sale of 50,000 acres of land of which *one-half* then belonged to the school fund— to which it was then entitled; and so without reference to how much land might find its way to that fund through alternate sections to be granted under the Act of August 16, 1876.

The same Legislature, five days later, passed a law declaring "that all the vacant and unappropriated public domain embraced in the territorial limits of the county of Greer be and the same is hereby appropriated, one-half thereof for public free schools for the education of the children of Texas, without reference to race or color, and the other half for the payment of the State debt." Why one-half to the school fund? Why not wait until one-half had been acquired through alternate surveys made by railway companies? Why not wait until there was a remainder to which the appropriation of "one-half of the public domain" would attach? The only answer is that the Legislature was of opinion that the appropriation was absolute the moment the Constitution took effect, and extended to one-half of the public domain as it then was, without reference to the appropriation of alternate surveys to be made under grants to corporations.

The same Legislature, by act approved July 14, 1879, which in some respects not now important was subsequently amended, directed the lands in fifty-three counties, as well as the unappropriated lands within the Pacific reservation and separate tracts of unappropriated lands situated in organized counties not containing more than 640 acres, to be withdrawn from location and sold; reserving, however, the lands to be surveyed as before directed for building the State Capitol. The lands thus withdrawn were directed to be sold, and the act declares that "*one-half* of the net proceeds of sales under the provisions of this act shall be and are hereby set apart for the benefit of the public free schools of this State. * * *

The balance of the net proceeds of sales under the provisions of this act shall be applied    *    *    *    to the payment and extinguishment of the bonded debt of the State of Texas, as the same becomes due and payable." Gen. Laws Spec. Sess. 1879, p. 48.    This act was repealed by an act approved January 22, 1883, in so far as sales were authorized, but the lands unsold were held in reservation for the purposes named in the former act. Why so persistently secure one-half of the lands within these reservations, or their proceeds, to the school fund, and at the same time forbid the acquisition of lands within that territory for that fund or for corporations through alternate surveys?    The answer is evident.    The Legislature understood that the Constitution appropriated one-half of the public domain to the school fund without reference to what it might receive in addition through alternate surveys, and in good faith intended to carry out the will of the people through these laws within the reserved territory.

By an act approved April 9, 1881, the Legislature donated to persons permanently disabled by wounds received while in the service of this State or the Confederate States 1280 acres of land each, but it provided that "the locator shall also locate a like amount of land for the benefit of the permanent school fund before either shall be patented."    Gen. Laws, p. 122. This is in harmony with the laws before referred to, and manifests the same purpose and understanding of the meaning of the Constitution by the Legislature.

By an act approved February 23, 1883 (Gen. Laws, p. 15), the Legislature, recognizing the right of the school fund to one-half of the proceeds of the sales of land made under the Act of July 14, 1879, and amendment thereto, and further recognizing the debt of the State to the school fund under the Act of November 12, 1866, directed the latter, as well as other recognized indebtedness of the State to the school fund, to be returned to that fund from the *half* of the proceeds of sale that did not belong to the school fund under the terms of the law directing the lands to be sold.

By an act approved April 10, 1883 (Gen. Laws, p. 71), the Legislature, after again recognizing the right of the school fund to one-half of the proceeds of sale made under the Act of July 14, 1879, and the payment of the indebtedness of the State to the school fund and to the University out of the other half, declared that "the remainder of said land, not to exceed 2,000,000 acres, contained in the counties and territory specially mentioned in said acts, or the proceeds thereof, set aside by said acts for the payment of the public debt, heretofore or hereafter to be received by the State, shall *one-half* thereof constitute a permanent endowment fund for the University of Texas and its branches, including the branch for the instruction of colored youths, and *one-half* shall constitute a permanent endowment fund for the common free schools of this State."

Thus we see the State kept up this equal division between itself and the

school fund, and when it donated to the University 1,000,000 acres of land it recognized the right of the school fund to a like quantity. Is not the reason for this too obvious?

Under these acts the absolute right of the school fund to one-half of the public domain as it existed when or until the Constitution took effect, without reference to alternate surveys, is recognized; and as in all these cases a like quantity of land secured to that fund was applied to some other purpose, there can be no pretense that in this distribution the fund received, either in quantity or value, *more than one-half of that part* of the public domain to which the acts have application. Their application is not to the entire public domain subject to the clauses of the Constitution in question, of which it declares the fund shall have one-half, and also alternate sections through grants made to corporations.

The only other lands received by the funds under the clauses in question came through alternate surveys, and there can be no claim that in this manner the fund has received either in quantity or value more than have the corporations. That a segregation of lands for the school fund according to value, except as this may be supposed to be reached through contiguous grants which may be presumed to be of equal value, was ever contemplated, all legislation bearing on the question refutes; and no single act can be found indicating the intention of the Legislature otherwise to do this, or a belief that it had been done. This strips the case of any pretense that the Legislature has by values or quantities attempted to segregate all the land to which the school fund is entitled under the third clause of the section in question. Throughout all the legislation since the adoption of the present Constitution there is but one act in which the rule recognized in the acts referred to has not been observed.

An act approved April 26, 1879 (Gen. Laws, p. 175), granted 640 acres of land to indigent veterans engaged in the struggle for Texas independence, and this was increased to 1280 acres by an amendment approved March 15, 1881. These acts authorized the certificates to be issued under them to be located as were headright certificates, and did not require each person to locate and have surveyed a like quantity for the school fund. These acts may not be in harmony with the others referred to in this respect; but if the question had to be decided on the preponderance of evidence furnished by acts of the Legislature, can there be any question where the great weight of that is to be found? Contemporaneous construction evidenced by acts of the Legislature is practically, with this single exception if it may be so termed, in favor of giving effect to the clear and unambiguous words found in the Constitution. In fact, it can not be claimed that facts exist which entitle appellant to invoke the maxim "*communis error facit jus.*"

It is insisted that the several executives of the State who have served the people since the adoption of the present Constitution have united in

construing the Constitution as appellant claims it should be. These distinguished men ought not to be subjected to such a charge unless those making it come prepared to sustain it. During the first two years after the Constitution was adopted the State had two Governors, one of whom soon after his inauguration was elected to the United States Senate. No legislation during his term of service as Governor has any bearing on the question involved in this case, and every communication made by him to the Legislature may be searched in vain for a single utterance to give color to the charge made against him.

During the term of his successor the acts of August 16, 1876, and of August 17, 1876, above referred to, were passed, and further comment on them is unnecessary. Besides these none others were passed which could have the remotest bearing on the question; but that he approved them is evidenced by his official acts.

With the vast amount of legislation necessary to adjust the laws to the requirements of the Constitution then first put in operation, it was not to be expected that all proper laws would be at once passed, nor that the executive would recommend all such laws, and failure in these respects ought not to be made a ground for claim that he placed on the Constitution a construction not evidenced by some affirmative act. Silence or nonaction can not be deemed evidence of construction unless a state of facts be shown in which this amounts to acquiesence when action was necessary to preserve right.

Before the Sixteenth Legislature met the people had called to the executive office a citizen throughly familiar from long residence and public service with the affairs of the State, with its laws and institutions, devoted to the interest of the people, and peculiarly well fitted by learning as well as a long, most honorable, and efficient judicial career to construe the Constitution.

The acts passed during his term of office have more bearing on the question before us than have all others passed since the Constitution was adopted. These acts, before noticed, received his approval, and with the single exception of the acts known as the "veteran acts" not one of them, in whole or in part, is susceptible of any other construction than one in entire harmony with the plain import of the language used in the Constitution and with the construction placed on that instrument by the very able judge who tried this cause. It is most probably true that it was expected to supplement the "veteran acts" in due time by such legislation as was necessary to give full effect to them without prejudice to any right secured by the Constitution; but that in the hurried grasping for lands before that was accomplished that state of affairs was found to exist which required the passage of the Act of April 22, 1882, withdrawing from corporations the further right to donations in aid of internal improvements; and that, even then, it was not known to what extent they had assumed

the right to appropriate lands.    On the immediate question before us that officer in his inaugural address used the following language:

"There are other obligations imposed upon the government of the State by the Constitution of equally as high a nature, which are to devote *one-half of all the public lands* to the *public school fund*, and 1,000,000 of acres to the University fund, and 3,000,000 of acres to the building of a capitol of the State.    *Under the present policy of procrastination* these *obligations* will not be met, and the people will have to be taxed to perform them."    Inaugural Address of Gov. O. M. Roberts, Jan. 21, 1879, House Jour. 1879, p. 112.

Here the appropriation of one-half of all public lands to the school fund is placed on the same footing as the appropriations made for the University and for building the new Capitol, all of which are recognized as resting on the Constitution.    While the alternate sections out of grants to be made to railroads or other corporations after the adoption of the Constitution were appropriated to the school fund by the Constitution, they were dependent on a contingency with the very happening of which the land thus to be acquired would be segregated.    That appropriation would take care of itself.    It could not be expected that in an inaugural address more than an outline would be given, and that here given is in strict conformity to the Constitution.

In a message to the Legislature soon afterwards the following language was used:

"The free common schools have their foundation in the Constitution of the State.    The mode and means of creating a permanent fund therefor, and of an available fund, with the manner of its distribution annually, are prescribed in the same instrument.    It results in fixing it as a duty upon the government of the State and not as a charity to educate the rising generation.    Its *permanent* fund *consists* of surveyed land of about 21,000,000 acres and *half of all the vacant domain,* making 15,000,000 acres *more set apart by the Constitution.*"    Message of Gov. Roberts, Feb. 10, 1879, House Jour., p. 342.

While, if the record before us is correct, the estimate of school lands at that time was too small, we have here an unequivocal declaration that the Constitution appropriated one-half of the public domain for the permanent school fund.    There is nothing in these official utterances of this executive, necessarily general in their nature, from which it can be fairly claimed that he construed the Constitution as appellant would have it. We find no act of either of the distinguished men who have succeeded him which evidences that they have construed the Constitution as appellant contends it should be, unless we are to presume that they have continuously issued patents on surveys made since the Constitution was adopted which amounts to a recognition of such a construction.    How far this has been done we are not advised; nor does it appear that a single patent has been

so issued which showed on its face that it was not under a location made before the adoption of the Constitution.

In the judicial department not a single utterance was heard in any court, prior to the decision of this in this court, which countenances the construction now put upon the Constitution.

In Fannin County v. Riddle, 51 Texas, 368, and in Day Company v. The State, 68 Texas, 526, it was, in effect, held without dissent that the language of the Constitution was to be given its ordinary meaning. While in these cases the question now before us was not directly involved, in the case last named it was indirectly involved, and a consideration of the several clauses of the section of the Constitution in question became necessary.

It has been held that the courts in construing a Constitution may look in doubtful cases to the proceedings of the convention that framed it; and so upon the theory that the people may be supposed to have adopted it with the same construction placed on it by their delegates. This at most is a class of contemporaneous construction, and some reference will be made to the proceedings of the convention that framed the present Constitution.

The second section of article 7 now found in the Constitution is literally as reported to the convention by the committee appointed to draft that article. The fourth and fifth sections are the same in all material respects. Jour. of Con., 517.

An amendment to the third clause of the section was offered, which was to strike out the word "half" and insert the word "all" in its place, which would have made that clause read "all of the public domain of the State." A substitute for that amendment was offered which consisted of a proposition to strike out the words "one-half of the public domain of the State." Jour., 612, 616.

Both of these amendments were defeated, but they show that the mind of the convention was called sharply to this clause; and, in fact, the journals show that the only serious contest over any part of the article that has any possible bearing on the question involved in this case was over the third clause of section 2. Had the amendment passed without any change being made in the preceding clause there would have been a conflict between the two which it would have been necessary to reconcile. Had the substitute for the amendment offered been adopted, the third clause would have been entirely stricken out, and there would have been no provision for the addition of lands to the school fund otherwise than through grants thereafter to be made in alternate sections as provided by the last branch of the second clause. The Constitution would then have meant what appellant contends it now does, with the second and third clauses remaining entire.

After attention was thus sharply drawn to the third clause and its word-

ing, it is not to be understood that the words were not intended to have their ordinary meaning, and there can be no reasonable doubt as to the interpretation put upon the clause by the convention, nor belief that the words were used with any hidden sense.

The journal teems with evidence that the real contest was not whether the school fund should have one-half of the public domain not otherwise appropriated by the Constitution, and in addition to this alternates from grants thereafter to be made to corporations, but was whether the Legislature should not be prohibited to make any grants to corporations to aid in improvements. Jour., pp. 342, 616, 621, 628.

These citations, and others, show that all propositions to place in the Constitution a provision granting lands to railway companies, or directing the Legislature to do so, although repeatedly offered, were defeated; and the compromise was that no clause requiring such grants to be made or denying the Legislature the power to make them was inserted. That matter was left to the discretion of future Legislatures. No such discretion was left to the Legislature in regard to the school fund. For that the people unhesitatingly made the appropriation, as appears in the Constitution itself, for the express purpose of placing the fund beyond legislative interference. As a compromise, with evident reluctance power was left in the Legislature to make grants to railway companies out of the unappropriated land, but even this power was placed under more than one restriction. Aid to immigration was expressly prohibited, except as this might be extended by homestead donations.

In the light of these facts, ought this court to contrast these purposes and therefrom draw inferences contrary to the plain import of the language used?

It is not proposed to consider any question of partition, or what has been termed the adjustment of equities, further than to say:

1. If the Constitution means what appellant claims, the State has no right on which to base partition, and neither party equities to adjust.

2. If it means what the State contends, then appellant has no equity to adjust or right to be secured which does not attach to the land in controversy and may be fully adjusted in this suit.

3. If the State's theory is correct, appellant certainly has not acquired any right joint or several in any land except to one-half of each of the sections in controversy, and there can be no claim that it has equities to adjust or partition to make on account of its failure to acquire right to land other than that in controversy, by reason of the fact that it would or might have acquired more land had the school lands been segregated.

4. No right can be acquired through partition which did not exist before; but through partition that right can be made to attach in severalty to a particular part of that before partition held in common.

5. Whatever right appellant has must be realized in this action, and

through the lands in controversy, without reference to any other lands, simply because it has no right in common or severalty, legal or equitable, in or to other lands.

All the public domain except 1,000,000 acres is shown to have been appropriated, and individuals and other corporations could not be compelled to surrender land acquired by them to make up to appellant the quantity of land it might possibly have acquired had the school lands been segregated; and at last, if it received the quantity of land now claimed by it, would have to do so out of lands appropriated to the school fund under the clause appropriating one-half the public domain, or the school fund would have to surrender some of its alternate sections.

The error of the proposition that appellant has equities to be adjusted, through partition or otherwise, is believed to result from a misapprehension as to the right it has obtained.

Reference to the quantity of public domain as it existed when or until the Constitution was adopted, and the disposition made of it, will show the practical operation of the rule insisted upon by appellant.

The statement will be taken from the record in this case, which shows that at date mentioned there were 71,961,277 acres of land, all of which except 1,000,000 acres had been disposed of when this cause was tried. Out of that was taken 4,000,000 acres for the erection of the Capitol and endowment of the University, which left 67,961,277 acres, to the one-half of which it must be conceded the school fund was entitled if the appropriation of "one-half of the public domain of the State" is to be given effect in accordance with the plain import of the language. That gives 33,980,610 acres; but all the land received by the school fund, including that sold, of which the proceeds were carried to its credit, amounts to only 27,871,552 acres.

Thus it will be seen that the school fund has received less than one-half of the public domain then existing and not otherwise appropriated by the Constitution, and there is no land left from which the residue can be made up, even if the fund was entitled only to one-half, if the claims of others who have assumed to appropriate lands are to be recognized in their entirety. This, however, would only leave a deficiency of 6,109,058 acres, which might be diminished 1,000,000 if that not appropriated when this cause was tried was made a part of the fund.

For corporations under alternate certificates 41,934,398 acres have been surveyed, and of this the school fund has received one-half, or 20,967,199 acres, which is included in the 27,871,552 acres before referred to, and corporations hold a like quantity.

If it be true that by the appropriation of "one-half of the public domain of the State" the school fund became thus entitled, then it is clear that in the alternate surveys received the fund has only received what it was entitled to in so far without reference to the appropriation made by

the last part of the preceding clause, for it would have been entitled to so much had no alternate surveys been made.

If land in so far was not subject to appropriation by corporations, it necessarily follows that the fund is entitled to one-half of each section of land that corporations holding alternate certificates have assumed to appropriate to themselves, for in no other manner can effect be given to both clauses of the Constitution on which the rights of the parties in this case depend.

The matter then would stand thus: Under the clause appropriating one-half of the public domain, the fund is entitled to 33,980,610 acres, and under the clause appropriating alternates from grants to be made to corporations, which is in effect but a declaration that for every grant made for a corporation a like quantity should go to the school fund, that fund would be entitled to 10,483,589 acres more, making an aggregate of 44,-464,209 acres. To meet this claim the fund has received only 27,871,552 acres, which leaves a deficiency of 16,592,267.

If, as believed, this deficiency exists, it can not be restored in manner so equitable as by enforcement of the spirit of the Constitution, which is believed to be in strict accordance with the letter.

Compel every person or corporation who has received two acres of land when only entitled to receive one to restore one, and the question will be settled without jar or confusion in accordance with the law. It is believed that any other method of enforcement of the right would not only operate great hardship in individual cases, but be in itself illegal.

Looking to the matter solely from the standpoint of expediency, the conclusion might be reached that the public good would be subserved if the State were to surrender its right in order to quiet titles and avoid hardship in many cases; but questions of that character must be addressed to the people, who alone have power to determine what is expedient and to pursue the course their own judgments and wills may dictate. Those charged with the enforcement of the laws have no discretion upon such a question, and courts can look to no such consideration in the determination of causes, but must as best they can ascertain and declare the law applicable to the facts presented and award such relief as these warrant.

Believing that the proper disposition of this cause was made by the court below, I am unable to concur in the disposition here made of it.